E. EDELMAN & COMPANY v. QUEEN STOVE WORKS, INC.[1]

March 24, 1939.

No. 31,907.

[1]Reported in 284 N. W. 838.

8

*Meighen, Knudson & Sturtz,* for appellant.
*Morgan & Nichols* and *Kent C. van den Berg,* for respondent.

GALLAGHER, CHIEF JUSTICE.

Appeal from an order denying defendant's motion for a new trial.

E. Edelman & Company, plaintiff, whose principal place of business is in Chicago, is a manufacturer of testing equipment and automotive replacement parts. The manufacture of rebuilt generators is incidental to its business. Queen Stove Works, Inc., defendant, whose principal place of business is in Albert Lea, manufactures oil-heating apparatus and gasoline pressure stoves. In 1935 it considered adding to its line the manufacture of windchargers, battery-charging units similar in appearance to a small windmill.

It planned to make in its factory all the parts of the windcharger except the generator, the wiring, and the meter for the instrument board.

Having been informed that plaintiff was furnishing generators for a competitor, defendant communicated with plaintiff by letter and later Mr. Trow, defendant's president, and Mr. Murphy, a salesman for a radio company, journeyed to Chicago, where they interviewed plaintiff's sales manager, Mr. Wray, and some of its technical experts. What was said at this conference has considerable bearing on the issues here involved. We quote from the testimony of Mr. Wray:

Q. "Did you have any further talk with Mr. Trow as to how these generators were to be made, that you discussed there while at your office?

A. "In detail at the time he was there, up to the point—and the specifications written, and up to the point that he says that as soon as he got back to the factory, he probably would want some samples, and would be in a position to place an order. That is the notations while he was at my desk, that I made on his first visit; that he wanted the generator to cut in at 4 to 500 revolutions per minute, and he asked me to make those notations so there would be no misunderstanding when his order came in, and the generators were to charge at least 8 to 10 amperes at 1,000 revolutions per minute.

Q. "That was a part of your talk at your office?

A. "Yes, sir, and I made the notations that when his order came, instead of putting down all the details, they would be made from these notations. The armatures—the generators we had previously made for the Dunn Manufacturing Company—contained, or had assembled into them these cutout screws, two screws on top of the shell, that another piece was fastened to the generator with. He said there was no use—we didn't need those screws. We furnished the Dunn Manufacturing Company a generator that had a gear on the end of the shaft. He said I have no use for that gear; don't put it on there; that notation was made. We made an improve-

ment for him over the generator made for Dunn, in that we placed a felt retainer or washer inside of one end of the generator. The reason for that was that when he advised me that the generator tipped up in the air it was liable to have water come down into the generator, and this was an improvement for which he paid, placing this felt retainer or washer on the inside of the generator. * * *

Q. "Who suggested those improvements?

A. "That I don't remember, except in the conversation between us, he wanted an improvement, and when that tipped up in the air, as I remember his device that he was to use this on, he tried to explain it to me, that when it obtained a certain speed, the generator would tip, and stand up on end, and he was afraid the water would run down in there. Well, any mechanic would figure out some way to keep that water from running in there, and we decided to use a felt washer saturated with oil, that would keep the water from running down in the generator when it was tipped up."

Mr. Trow testified:

Q. "And tell us your conversation fully with Mr. Wray that day.

A. "We started back at the beginning of our experience in the windcharger business, and led up to what had happened in connection with the Zenith charger, and told him that we understood that he was selling a remade, or reconditioned Ford generator to the Dunn Company at Clarinda, and asked him if it would be possible for us to buy that same generator, and he said yes, and we explained to him that we didn't know much about making windchargers, and knew less about generators, and asked a lot of questions as to what he thought we should have in the way of a generator for this windcharger of ours, that would do a satisfactory job, insofar as charging a farm radio battery is concerned. He wanted to know if we had a picture of our charger, and we showed him these three photographs we have shown here, and explained how the charger operated, and naturally, he was interested in the governor, and we explained that to him, and he wanted to know all about the propeller, because that was something new he had not seen before, and he told us that he was furnishing those generators to

Dunn, as I remember it, at $2.80 and he says, we can furnish you the same generator at the same price. He says, as far as I know, it is doing a satisfactory job for them, and I am sure it will do a satisfactory job for you. I do remember there was one point that came up, and that was that due to the fact that our propeller tips up when it is pulled out of operating position, he suggested it would be a good idea for me to put this felt washer which he spoke of, in the head of the generator, so as to prevent any moisture from getting in when the generator was tipped up in that position and not operating, but when the generator was operating, and was turning so fast, there was no danger of any water getting in there to cause any trouble. He took us out, I remember, into the plant, and he showed us a stock of these Ford generators—I don't know how many but there were a large number of them that they had stacked up in different bins, to show us he had a big stock of generators he was furnishing Dunn, and could furnish to us, so we didn't have to worry—he could take care of all the business we could turn over to him, and then he took us over to a bench and called some man over there to show us just how they would test every one of these generators, so we could absolutely depend on them, and every generator would do what he told us it should do in order to do a satisfactory job of charging, so I—on the strength of what he told us, we went back in the office, and talked over more details, and on the strength of what he told us we says, all right, we would give him the business, and when I get home, I will mail him an order.

Q. "Had you at that time ever seen a Dunn charger?

A. "No, sir.

Q. "Didn't you know what they looked like?

A. "No, sir.

Q. "Have you ever seen a picture of one?

A. "Not that I can remember of.

Q. "Do you know how many amps it was necessary to charge in order to properly charge a battery?

A. "Mr. Wray told us if we could furnish—if the generator

furnished up to six or seven or eight amps, that was a good charge with a radio battery.

Q. "Had you ever had any electrical training?

A. "None whatever.

Q. "Know anything about generators or electricity?

A. "No, sir.

Q. "At that time was anything said about gears? I notice the order says, no gears.

A. "I presume there was. I presume that Mr. Wray explained that ordinarily these generators came with a gear on the end of the shaft, and we knew how we intended to make the propeller hub, and we didn't need that gear on there so it was understood that the gear was to be taken off.

Q. "There is a statement on the order blank which says, no cutout screws; who framed that statement?

A. "I don't know; I can't remember. I imagine there must have been some part of the apparatus that we attached to the generator, or we expected to put a screw right back into the screw hole in the generator case, but after looking at the generators as we received them, I cannot understand how that can be because some of these generators that we got had some screws, and some of them didn't have screws in.  *  *  *

Q. "What further talk, if any, did you have with Mr. Wray, about the purpose for which the generators were to be used?

\*    \*    \*    \*    \*

A. "We asked him if the bearings would all be in good shape, and he said yes, that if any of these generators, when they were disassembled, if the bearings were worn or cracked, not in first class shape, they would replace them with new bearings, and if the commutators were worn down below a certain—I think it was beyond 20 per cent of normal size, they would be replaced with new ones, and all of the armatures were to have a certain sized wires, and a certain number of windings, so that they would cut in at between four and five hundred.

\*    \*    \*    \*    \*

Q. "Did you direct or state the size of the wire to be used?
A. "No.

\* \* \* \* \*

Q. "Did you know what size wire should be used?
A. "No, sir.

\* \* \* \* \*

Q. "Did you know what the Dunn generator was?
A. "No."

There was other testimony, particularly that of Mr. Murphy, that might well be included, but so to do would unduly lengthen this opinion. Suffice it to say that it quite fully corroborates that given by the witness Trow to the effect that defendant relied to some extent at least on plaintiff's judgment in ordering the generators.

Shortly after the Chicago conference and under date of August 22, 1935, defendant mailed to plaintiff an order for 1,000 generators. It reads:

"Queen Stove Works, Inc.

To: E. Edelman & Co.
  [etc.]

Date: 8-22-35
Terms: 30 days on 1/3
  60 " " "
  90 " " "
Less 2% cash
15 days

Please enter our order for
1 M Reconditioned Generators, to cut in at four to five
  hundred rpm.
  To charge up to 8 to 10 amps.
  No cutout screws
  No gears
  Felt retainer on the drive end
  To be packed in a fibre shipping carton
  Price $2.80
  Shipment to be made as ordered direct to our customers."

In accordance with instructions, the first ten generators were shipped to defendant at Albert Lea and upon trial were found to be satisfactory. About the same time defendant began to take orders for windchargers and to order out the generators purchased from plaintiff for assembly in the chargers. Shipments were made to defendant's customers scattered throughout several states.

Defendant claims that within a short time after the windchargers were put in service it began to receive complaints that the generators were defective. The distributors began to return them, some to defendant at Albert Lea and others to plaintiff at Chicago. It appears that a large number of the generators were returned as unsatisfactory. Two hundred and seventy-nine of the original 1,000 generators were never ordered shipped by defendant and were in plaintiff's possession at the time of the trial.

In plaintiff's action to recover the balance of the purchase price defendant answered contending that the generators were defective and counterclaimed for damages for breach of warranty. Plaintiff denied the breach of warranty. The cause was tried before a jury, which found for plaintiff and assessed damages in the sum of $534.31. A denial of defendant's motion for a new trial brought about this appeal.

■ The trial court was of the opinion that the question of warranty of fitness for the use for which the generators were purchased was, under the evidence, out of the case and so instructed the jury. Its position in that respect is reflected in the following instructions given by it to the jury:

"It is plaintiff's claim that these generators were wired and assembled exactly as Mr. Trow directed, that they were so built, and each tested and packed for shipment awaiting orders from Mr. Trow. There has been a claim advanced by defendant that Mr. Wray warranted these generators as fit for use in windchargers. On the testimony of both Mr. Wray and Mr. Trow, that claim is not established and is out of this case. Sales talk, puffing, or bragging talk is not fraudulent, and not unlawful, although sometimes we do not agree with it. But this windcharger machine was the child,

I might say, of the Queen Stove Works. Whether it worked or not was the responsibility of the Queen Stove Works. The requirement of Edelman & Company was to build the 1,000 generators exactly according to specifications, and when it had done so, if it did, that was its part of the contract, in which case it would have been the duty of the defendant to accept and to pay for the generators so purchased, whether they would function in the windcharger, or whether they would not."

The earlier decisions of this court, and particularly those rendered prior to 1905, if followed to the exclusion of our later decisions, would probably justify the position taken by the trial court. The rule recognized in Cosgrove v. Bennett, 32 Minn. 371, 20 N. W. 359, and followed in Goulds v. Brophy, 42 Minn. 109, 43 N. W. 834, 6 L. R. A. 392; Wisconsin Red Pressed-Brick Co. v. Hood, 54 Minn. 543, 56 N. W. 165; and Holt v. Sims, 94 Minn. 157, 102 N. W. 386, as stated in 2 Benjamin, Sales (4 Am. ed.) §§ 987, 988, is [see 42 Minn. 111]:

" 'Where a manufacturer or a dealer contracts to supply an article which he manufactures or produces, or in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, there is, in that case, an implied term of warranty that it shall be reasonably fit for the purpose to which it is to be applied.' But 'where a known, described, and defined article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still if the known, defined, and described thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer.' In short, that there is no implied warranty, where the buyer gets what he bargains for, though it does not answer his purpose."

From the standpoint of the respondent, the case of Goulds v. Brophy, *supra*, is the strongest authority. The instant case is distinguishable on its facts in that in the Goulds case there was no showing that the buyer went to the seller, informed him of his ignorance respecting the goods to be purchased, and adopted a de-

scription because of reliance on the seller. There is here evidence in the record from which the jury could infer these facts.

The last of the Minnesota cases referred to was decided in 1905. In the rapidly changing field of commercial transactions, facts which justify a holding that a warranty is precluded need not be considered a binding precedent so as to require the same holding a quarter of a century later. Further, the law of implied warranties should be extended rather than restricted. Bekkevold v. Potts, 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164.

2 Mason Minn. St. 1927, § 8390 (1), provides:

"Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

This provision is limited by subd. (4) of the same section, which provides:

"In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

These sections were adopted from the uniform sales act in 1917 and codify the rules at common law. See 1 Williston, Sales (2 ed.) § 227. The recent decisions of this court indicate a tendency to liberalize the rules pertaining to implied warranties of fitness for the purpose. A striking illustration is the case of Bekkevold v. Potts, *supra,* where it was held that a warranty of fitness could be implied where the seller of personal property knew the purpose for which it was to be used and the buyer relied on the seller's judgment that it was suitable therefor—and this notwithstanding the fact that the written contract excluded warranties "made" by the seller. In Iron Fireman Coal Stoker Co. v. Brown, 182 Minn. 399, 234 N. W. 685, where this court was called upon to consider the provisions of the sales act, Chief Justice Wilson, speaking for the court, said at p. 401:

"The situation is quite different where the buyer yields to the trade talk of a salesman who sells him something that is wholly unknown to him. Perhaps it might be said that where the buyer selects the article, subd. 4 applies; and where the seller selects the article suitable for the purposes needed, subd. 1, hereinafter mentioned, applies. We are of the opinion that where the buyer fully informs the seller of his particular needs and the seller undertakes to select or supply the article suitable for the purpose involved, subd. 1 applies even though the article may be described in the contract of sale by its trade-name."

See also Federal M. T. Sales Corp. v. Shanus, 190 Minn. 5, 250 N. W. 713; Hansmann v. Pollard, 113 Minn. 429, 129 N. W. 848. Where description by the buyer does negate the implication of a warranty of fitness for the purpose, it is for the reason that the buyer thus indicates that he is not relying on the skill and judgment of the seller. See Iron Fireman Coal Stoker Co. v. Brown, *supra*, at p. 400. When facts are introduced showing that the description was adopted by the buyer because of reasonable reliance on the superior judgment of the seller, the reason for the rule limiting the implied warranty obviously disappears. The reason disappearing, the rule will not be applied. We therefore conclude that where the buyer, ignorant of his own needs, fully informs a seller as to the purpose for which an article is to be used, and, after doing so, adopts the description supplied by the seller, a warranty of fitness for the purpose can be implied. See London Guarantee & Accident Co. Ltd. v. Strait Scale Co. 322 Mo. 502, 15 S. W. (2d) 766, 64 A. L. R. 936; B. F. Sturtevant Co. v. LeMars Gas Co. 188 Iowa, 584, 176 N. W. 338; Long v. Five-Hundred Co. 123 Wash. 347, 212 P. 559. See generally 59 A. L. R. 1180; 35 Col. L. Rev. 950.

The record in this case discloses that evidence was adduced from which the jury might well find that the generators which were ordered were selected by the seller, who knew the purpose for which they were intended, and that the buyer reasonably relied on the seller's skill and judgment in accepting this selection. Objections

to further evidence to the same effect were sustained. From the evidence admitted the jury could properly have found an implied warranty of fitness for the purpose. The evidence rejected will no doubt be admitted in the event that it is offered during the course of a new trial.

■ The fact that the goods were secondhand does not preclude a warranty of fitness. This court has not hesitated to affirm a judgment based on a finding of such a warranty in the sale of secondhand goods. Harris Machinery Co. v. Heiner, 180 Minn. 19, 230 N. W. 114; Saunders v. Cowl, 201 Minn. 574, 277 N. W. 12. The determinative factor is whether or not there is reasonable reliance on the part of the buyer. That the goods are secondhand is but a fact tending to show that reliance was unreasonable. It is not necessarily conclusive of the issue.

The circumstances of the instant case as disclosed by the record were such as to lead a reasonable person to expect that the rebuilt generators would be practically as good as new. This is not a case of a buyer obtaining worn-out machinery which no one could be expected to guarantee. Instead it appears that representations were made that the salvaged parts of old generators were used only if found to be in good condition. The distinction between such a case as this and that of the purchase of new goods is too fine to justify the trial court in adopting the theory that reasonable reliance was excluded as a matter of law.

Cases from other jurisdictions support the theory that the question of whether there can be an implied warranty of fitness for the purpose in the sale of secondhand goods depends entirely on the circumstances. In Bouchet v. Oregon Motor Car Co. 78 Or. 230, 152 P. 888, it was held that a dealer in automobiles impliedly warranted that a secondhand automobile was fit for a special purpose when he sold it under that claim. The seller there asserted that the car had been partially rebuilt. In Markman v. Hallbeck, 206 Ill. App. 465, the court said that it was not error to refuse an instruction that upon the sale of secondhand goods no warranty was implied. To the same effect are Hall Furniture Co. v. Crane Mfg. Co. 169 N. C. 41, 85 S. E. 35, L. R. A. 1915E, 428; Walker, Evans

& Cogswell Co. v. Ayer, 80 S. C. 292, 61 S. E. 557; New Birdsall Co. v. Keys, 99 Mo. App. 458, 74 S. W. 12; Guyandotte Coal Co. v. Virginian Elec. & Mach. Works, 94 W. Va. 300, 118 S. E. 512; Latham v. Shipley (1892) 86 Iowa, 543, 53 N. W. 342; Varley v. Whipp [1900] 1 Q. B. 513, 69 L. J. Q. B. [N. S.] 333.

■ The next matter to be considered is whether the court erred in rejecting the defendant's offer of proof of special damages which it claimed to have incurred and which include telephone, telegraph, and postage expense, charge-offs, loss of profits, and other items. The state of the record is such as to make it difficult, if not impossible, for us to pass on this question. The first problem that should have been settled, in our opinion, was whether the contract in question was entire or severable. The determination of this question was of fundamental importance. Where the contract is entire the remedies of rescission and recovery of consequential damages are considered to be mutually exclusive for the reason that the former negates the contract while the latter presupposes that the contract has been affirmed. Kirby v. Dean, 159 Minn. 451, 199 N. W. 174; Skoog v. Mayer Bros. Co. 122 Minn. 209, 142 N. W. 193; Scheer v. Harbaugh Co. 165 Minn. 54, 205 N. W. 626; Dohs v. Kerfoot, 183 Minn. 379, 236 N. W. 620. Where the contract is severable the buyer can, with reference to any one of the parts into which the contract is divisible, affirm or rescind without prejudice to his choice as to the other parts. See Fiterman v. J. N. Johnson & Co. 156 Minn. 201, 194 N. W. 399; B. F. Sturtevant Co. v. LeMars Gas Co. 188 Iowa, 584, 176 N. W. 388. Even in such a case it is obvious that the buyer can recover consequential damages only to the extent caused by defects in those goods as to which he has affirmed. The record discloses no effort on the part of the plaintiff to require an election by the defendant. Neither does it appear that any effort was made to procure a determination of the question of whether the contract was divisible or entire. Ascertaining the intent of the parties would solve the latter problem. McGrath v. Cannon, 55 Minn. 457, 57 N. W. 150; Potsdamer v. Kruse, 57 Minn. 193, 58 N. W. 983; Johnson v. Fehsefeldt, 106 Minn. 202, 118 N. W. 797, 20 L.R.A. (N.S.) 1069. See generally 2 A. L. R. 643.

In the event of a new trial this must be done unless the parties can stipulate as to the matter. This having been done, we feel that the trial court will experience no difficulty in submitting the issue of damages to the jury under proper instructions.

It is contended that the sum of $38.50 should not have been excluded as a payment on the contract price for the order for 1,000 generators. The general sales manager for plaintiff testified that 721 of the 1,000 generators were delivered. Exhibit 37, which constitutes a breakdown of this figure, includes the 10 generators for which the $38.50 was paid. In view of these facts, the trial court should not have held that as a matter of law no credit should be given for this amount.

Order denying defendant's motion for a new trial reversed.

MR. JUSTICE HILTON, incapacitated by illness, took no part.

