## United States Gypsum Co. v. Birdsboro Steel Foundry & Machine Co.

260

*Duane, Morris & Heckscher,* for plaintiff.
*Robert T. McCracken,* for defendant.

OLIVER, P. J., April 14, 1942.—This matter is before us on a statutory demurrer to the statement of claim in a suit to recover damages for breach of both implied and express warranties in the sale of machinery.

From the averments of the statement, we find that, on June 27, 1936, defendant, having theretofore held itself out as particularly skilled and experienced in the

matter of designing and manufacturing hydraulic presses and press equipment for special manufacturing purposes, entered into a written contract with plaintiff to manufacture and sell to plaintiff a 9,000-ton hydraulic press and press equipment designed to operate as an integral unit, as described in the contract which consisted of two letters between the parties, copies of which are attached to the statement of claim. Defendant manufactured the press equipment, delivered it to plaintiff, and installed it in plaintiff's plant during the month of February 1937. Plaintiff purchased the press and equipment for use in the manufacture of asbestos roofing, which use required a precision machine designed and constructed to operate as an integral unit in plaintiff's manufacturing process, withstanding the stresses and strains of normal operation and performing continuously the function of applying a uniform pressure on unpressed asbestos cement sheets. The particular purpose and use for which the press and equipment were ordered were made known to defendant by plaintiff. In the purchase, plaintiff relied upon defendant's skill, judgment, and experience in the design and manufacture of that type of machinery. Plaintiff avers that defendant "warranted" the press and equipment to be fit for its intended purpose. We assume plaintiff, by that averment, refers to an implied warranty of fitness.

In addition, plaintiff relies upon certain express warranties contained in the first three paragraphs of the following provisions of the written contract (italics supplied):

"The above equipment is *guaranteed to perform* as follows:

"(1) It will be *suitable* to apply on a sheet 4'6" wide by 12'6" long, a total uniformly distributed pressure of 9,000 tons.

"(2) Under this pressure, the maximum combined deflections of the platens will not exceed .012". The

deflections will be tested by making use of a multiplicity of lead solder wires, and then applying the full pressure of 9,000 tons on the wires, and after such treatment, the individual lead strips will be miked, and their difference in thickness used to determine the amount of deflection.

"(3) The various motions of the press and conveyor mechanism will be synchronized *in a semi-automatic fashion,*—that is, the up and down motions will be controlled by operating the lever of an operating valve by hand. The starting of the conveyor will be done by depressing a push button, and its stopping will be done automatically. With a daylight space between dies of approximately 3″, and under the assumption that the green sheets will be placed on the loading table of the conveyor while the sheet in the press is being pressed, the total time (when operating at high speed with the present pump) of conveying the sheets into the press, lowering the press, building pressure on sheets in 30 seconds, opening press to the 3″ start of opening will be done in not less than 52½ seconds. The degree of accuracy would contemplate the centering of the sheets in the press within tolerances of about 2″. With the addition of the second pump later the pressing period would be reduced to 15 seconds, and the total cycle period will then be not more than 37½ seconds. The above equipment is *further guaranteed* with proper care of valves and of contacts and other electrical devices *to function continuously in the manner as above described.* [In and by plaintiff's acceptance the words 'not less than 52½ seconds' are corrected to read 'not more than 52½ seconds.]

"(4) The above machinery will be of first class materials and workmanship throughout, and will be guaranteed against defects in materials and workmanship under normal use and service for a period of one year after date of shipment, the obligation under this guarantee being limited however to furnishing or re-

pairing without charge f. o. b. our works a similar part to replace any part, which within three months from date of starting and not more than one year after date of shipment is proven to have been defective at the time it was shipped, provided the purchaser has given us immediate written notice upon the discovery of such defect. We reserve the option of requiring the return of the defective material, transportation prepaid, to establish the claim. We shall in no event be held liable for damages caused by defective material, and no allowance will be made for repairs or alterations unless made by our written consent or approval. We shall not be held liable for any special, direct or consequential damages."

There are no other provisions in the contract relating to warranties or limitation of liability for damages, and there is no provision to the effect that all prior communications, conversations and agreements are merged in or superseded by the writing.

Plaintiff avers that, relying upon the warranties above mentioned, it paid the purchase price for the press and equipment, $47,000, and the delivery and installation expenses amounting to $8,500, and that it subsequently discovered that the press equipment was not of the quality or condition and not capable of performing as warranted, and, because of improper design and construction, was unfit for the purpose intended. More particularly plaintiff alleges that, in the course of normal operation, the three main pressure cylinders and the tension bolts and nuts cracked; that the pump and pump equipment attached to the press were of faulty and obsolete design and construction and of insufficient capacity to operate the press in the manner in which it was intended to operate; and that the filler valve and supports broke down because they also were of improper design and construction. Plaintiff avers further that, as soon as its diligent investigation of the causes of these failures of the press equipment revealed

that they were due to defendant's breaches of warranty, it promptly notified defendant that it would hold defendant responsible therefor.

As a result of these alleged breaches of warranty, plaintiff had to replace the parts of the press equipment, which broke down, at a total cost of $57,270.

In the case of the main pressure cylinders and the nuts and bolts, plaintiff avers there was a second failure, which necessitated the purchase by it of a third set of equipment. Plaintiff avers that all of the replacement parts and equipment were purchased by it from defendant, after fully making known to defendant the intended uses thereof and in reliance by plaintiff upon defendant's skill and experience, and that defendant warranted that the replacements would be fit for the purposes intended. We assume plaintiff refers to an implied warranty.

According to the statement of claim, the replacements were not fit for such uses and therefore they were unable to withstand the stresses and strains of normal operation of the press.

The statement of claim indicates in paragraph 26 that, even after all the replacements had been made, the press and equipment were still defective. If that is so, it is difficult to understand why the damages claimed include only the moneys paid for the replacements, and do not include, in addition thereto, damages arising from the fact, if it is a fact, that the machine, even after those expenditures had been made, was still not suitable for its intended use. Also, the statement fails to state whether these replacements were of the same design and construction as specified in the original contract or either were, or were intended to be, of a different design and construction.

Defendant's statutory demurrer questions the legal sufficiency of the statement of claim for the following reasons: (1) That there was no implied warranty of fitness for a particular purpose, because a definitely

described hydraulic press was ordered and defendant delivered the press ordered; (2) that there is no averment in the statement that the press, when delivered, would not perform in accordance with the guaranties of performance set forth in the contract; (3) that the statement discloses that no complaint was made by plaintiff of alleged defects in materials and workmanship until two years and six months after delivery of the press and equipment; (4) that defendant's liability for defects in materials and workmanship was limited, by the specific warranty in the contract, to furnishing or repairing without charge parts to replace defective parts, provided immediate notice of the discovery of such defects were given within three months from the date of starting the press and not more than one year after the date of shipment.

In effect, defendant contends that plaintiff cannot recover under the facts alleged on any theory of express or implied warranty, and that, therefore, the demurrer should be sustained.

It is apparent that plaintiff's right to recover depends, first, upon the existence of the alleged implied warranty of fitness as to the original equipment and the replacements, and, secondly, upon the express warranties contained in numbered paragraphs 1 to 3 of the written contract, without qualification of those warranties by any of the clauses limiting liability contained in numbered paragraph 4.

Section 15 of The Sales Act of May 19, 1915,.P. L. 543, 69 PS §124, deals with "implied warranties of quality or fitness" and contains the following provisions:

"First. Where a buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. . . .

"Fourth. In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

In a supplemental annotation, under the subject of "Implied warranty of fitness on sale of article by trade-name, trademark, or other particular description", it is stated in 90 A.L.R. 410 (1934), at page 411:

". . . the raising of an implied warranty of fitness depends upon whether the buyer informed the seller of the circumstances and conditions which necessitated his purchase of a certain general character of articles, and left it to the seller to select the particular kind and quality of articles suitable for the buyer's use. And this is true without reference to whether the rules of the common law or the Uniform Sales Act apply, except that, under the act, a dealer is placed under the same responsibility as a manufacturer, and the term 'trademark' or 'tradename' is employed, rather than the term 'specific, described article.' *Under either rule the major question, in determining the existence of an implied warranty of fitness for a particular purpose, is the reliance by the buyer upon the skill and judgment of the seller to select an article suitable for his needs, and the question as to whether the article was described by its tradename or trademark is not conclusive, if the other conditions exist which would raise an implied warranty of this character.*" (Italics supplied.) Numerous authorities are cited to support the conclusions thus expressed.

In an earlier annotation, in 59 A.L.R. 1180 (1929), at which time the decisions had not reached a clear stage of uniformity, it was stated at pages 1186 and 1187:

". . . it is believed that the discussion by the different courts of the question whether subd. 1 or subd. 4 [of section 15 of The Sales Act] shall apply where the buyer clearly relies upon the skill or judgment of the

seller is of sufficient interest and importance to justify bringing together the cases which expressly discuss this point. . . . As thus classified, the cases almost irresistibly lead to the conclusion that where as a matter of fact the buyer fully informed the seller of his particular needs, and the seller undertook to select or supply an article suitable for this purpose, the rule of subd. 1 applies, even though in the order or contract of sale the article is specifically described by its trademark, tradename, or otherwise. On the other hand, where the selection of the article is actually made by the buyer, subd. 4 applies, even though the seller knew that the buyer was purchasing the article for some particular use, and induced the contract by trade talk with reference to the general good qualities of the article." And, at page 1188:

"This problem has given rise to a considerable discussion of the rules referred to, especially (1) and (4), and there is a lack of harmony manifest in the decisions, some of which apparently overlook the fact that where the seller, after acquiring knowledge as to the needs of the buyer, recommends a certain article as suitable, the purpose for which the buyer requires the article, and not the specific article itself, is the essential matter. In these circumstances, it would seem, the fact that the buyer purchased in reliance upon the knowledge and skill of the seller should be the controlling factor, rather than the mere fact that, in the contract of sale, the article is described by its trademark or tradename."

The supplemental annotation, above quoted from 90 A.L.R., shows clearly that the views thus expressed in the earlier annotation have received general acceptance by the courts throughout the United States. It was followed in this State by our Superior Court in Hobart Manufacturing Co. v. Rodziewicz, 125 Pa. Superior Ct. 240 (1937). In his opinion in that case, Judge Baldrige states (pp. 246, 247):

"Assuming that 'Hobart Model M-80' is a trade name, as alleged, it does not follow that there may not be an implied warranty of fitness, if the circumstances indicate that the buyer informed the seller of the purpose for which the article was desired and that there was a reliance upon the seller's judgment, especially where the trade name was inserted in the sales contract merely as a convenient description: . . .

"If one *selects* some article by its trade name, even though the buyer has communicated his particular purpose of its use, there is no implied warranty of fitness for that particular purpose: . . .

"But in the case at bar, it is alleged that the purchaser relied, not upon the trade name of the mixer, but upon the representation made and the judgment of the seller as to the results that could be obtained by its use."

In E. Edelman & Co. v. Queen Stove Works, Inc., 205 Minn. 7, at page 17, the court holds:

"We therefore conclude that where the buyer, ignorant of his own needs, fully informs a seller as to the purpose for which an article is to be used, and, after doing so, adopts the description supplied by the seller, a warranty of fitness for the purpose can be implied."

It is strongly contended by defendant, however, that, whatever may be the law generally, the case now before us is definitely governed in defendant's favor by the decision of our Supreme Court in Hill & MacMillan, Inc., v. Taylor et al., 304 Pa. 18 (1931), in which Mr. Justice Maxey said, at page 21:

"It is well settled law that if a thing be ordered of the manufacturer for a special purpose, and if it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose. But this principle is limited to cases where a thing is ordered for a special purpose, and must not be applied to those where a special thing is ordered, although this be intended for a special purpose: Savings Bank v. Trust Co., 210 Pa.

320; Port Carbon Iron Co. v. Groves, 68 Pa. 149; Seitz v. Brewers Refrigerating Machine Co., 141 U. S. 510. Inasmuch as in this case a special, definitely described thing was ordered, although intended for a special purpose, and the plaintiff delivered to the defendant the special thing ordered, the doctrine of implied warranty does not apply to it."

However, an examination of the printed record in that case shows that the case definitely falls within the group of cases in which the purchaser does *not* rely upon the skill or judgment of the seller. As above shown, all such cases are governed by subdivision 4 of section 15 of the Sales Act. It is clear in any event that they do *not* meet the conditions specified in subdivision 1 of that section, and that, for that reason alone, they will not support any claim of implied warranty.

The opinion of the lower court states: "By this written contract the defendants for the price therein stated agreed to purchase from the plaintiff one six-ton H. & M. Gasoline Locomotive of the character and hauling capacity set forth in the contract. The plaintiff guaranteed the locomotive free from inherent mechanical defects of labor and material, and agreed to replace on order without charge, any defective part within three months from date of shipment, provided examination proved the claim, and the defendants agreed that no other claim for loss or damage of any description would be made against the plaintiff. The contract contains a further provision to be noted in determining the question above stated, viz: 'The foregoing is the agreement between said parties as it exists at this date, and it is agreed and distinctly understood that all previous communications between said parties, either verbal or written, not herein contained are herewith withdrawn and annulled; and that no modification of this agreement shall be binding upon the parties hereto, or either of them, . . .' [Record pp. 138a-139a]. . . . A breach of an implied warranty is suggested. It

is clear on reflection that there could be no implied warranty that the locomotive would do the required work of handling from eighty to one hundred cars in eight hours, the failure to do which is the gist of the complaint. Nor do we find anything in the affidavit of defense that may be construed as a recital of any implied warranty and a breach thereof, . . . [Record pp. 143a-144a]. . . . The written contract showed in tons of two thousand pounds, the hauling capacity of this locomotive with good, fair or poor cars, on level tracks, on tracks with curves and on tracks with grades, the hauling capacity at different percentages of grade being stated. It not being pleaded or proven that the locomotive did not possess the hauling capacity stipulated, *it is not clear how it can be seriously urged that there was an implied warranty that it possessed a hauling capacity differing from and in excess of that stated in the written contract.*" (Record p. 145a. Italics supplied. Page 13a of the record sets forth a schedule of the "Rating Hauling Capacities" of the six-ton locomotive, as attached to the contract and above referred to by the lower court.)

The lower court then properly applied subdivision 4 of section 15 of The Sales Act (record, p. 144a), and held: "As we now view the case an implied warranty within the legal meaning of that term and a breach thereof were neither pleaded nor shown by the testimony introduced." (Record p. 146a).

Furthermore, the lower court's opinion shows that the buyer (appellant) averred, attempted to prove, and relied upon an alleged oral express warranty of fitness and merely "suggested" that there might be an implied warranty to the same effect. The brief of the seller (appellee, page 1) states that the buyer tried its case exclusively on the theory of an express warranty and did not even "attempt to take refuge in the claim of a breach of an implied warranty" until after the seller had submitted its point for binding instructions.

The case before us clearly falls in a different category and, as shown above, is governed by the provisions of subdivision 1 of section 15 of The Sales Act. Plaintiff went to defendant to obtain a suitable press and equipment, because defendant had held itself out as having especial skill and experience in designing and manufacturing hydraulic presses and equipment for special manufacturing purposes. Plaintiff made fully known to defendant the particular purpose for which it required a suitable press and equipment and it relied upon defendant, by reason of its skill, judgment, and experience, to design, manufacture, and deliver a press and equipment, which would be fit for such purpose. The designs, blueprints, and specifications were prepared by defendant, as a manufacturer possessing special skill and experience in such matters, and the press and equipment were manufactured by defendant in accordance with those designs, blueprints, and specifications. Plaintiff relied entirely upon defendant's skill and experience. It would be a travesty upon justice if defendant could relieve itself of the implied warranty which thereby arose, both under the common law and under subdivision 1 of section 15 of The Sales Act, by the simple expedient of submitting, with its detailed bid, a set of blueprints and specifications. Even after looking over such blueprints and specifications, a purchaser, unskilled and inexperienced in the designing of complicated machinery, would normally still have to rely upon the designer's skill and knowledge, and the purchaser's acceptance would ordinarily mean no more than that it was given in reliance upon the vastly greater skill and experience of the designer and manufacturer who prepared them. In any event, no court should hold as a matter of law that there was no implied warranty under such circumstances. If defendant in this case contends there was in fact no such reliance, the issue then becomes one of fact for the jury.

We are confident that, in so holding, we are not running counter to the decision in Hill & MacMillan, Inc., v. Taylor et al., supra, which was clearly correct upon the facts then before the court. See also the discussion on page 16 of the opinion by Mr. Justice Stern in Truscon Steel Co. v. Fuhrmann & Schmidt Brewing Co., 327 Pa. 10, wherein Hobart Manufacturing Co. v. Rodziewicz, supra, is cited.

From the above it is apparent that most of the decisions throughout the country hold that subdivision 4 of section 15 of The Sales Act is subordinate to subdivision 1 of that section, and that the controlling factor in all cases, even where an article is described by its trade name or trade-mark, is whether or not the buyer relied upon the skill and judgment of the seller to select or furnish an article suitable for his needs. See 90 A.L.R. 410 (1934) and authorities therein cited and Hobart Manufacturing Co. v. Rodziewicz, supra. As we are here dealing with a uniform act, adopted by many States, the decisions of the courts of those States construing the act are entitled to more than ordinary weight. However, if our own Supreme Court, when faced with this question, should hold a contrary view, and decide that subdivision 4 is controlling wherever by its terms it is applicable, even though there may in fact have been a complete reliance by the buyer upon the skill and judgment of the seller, we then face the fact that subdivision 4, as pointed out in 90 A.L.R. 410, substituted for the words "a special thing" and "a known, described and definite article", as used in the previously decided Pennsylvania cases (see American Home Savings Bank Co. v. Guardian Trust Co., 210 Pa. 320, 325, 1904), the words "a specified article under its patent or other trade name." Quite obviously the statute limited subdivision 4 to cases in which the article is "specified", and specified "under its patent or other trade name." The terms of subdivision 4 are therefore not applicable

to every "special thing", but only to a special thing which has been specified "under its patent or other trade name." The conclusion is irresistible that The Sales Act thereby limited the scope of the common-law exception to the rule embodied in subdivision 1.

In the case before us, the press and equipment was specially designed by the seller to meet the buyer's needs. It had no patent or other trade name and was not specified under any such name. Clearly, therefore, even if it were decided in this State that no implied warranty can arise, notwithstanding the fact the provisions of subdivision 1 are fully met, in cases where the article falls within the provisions of subdivision 4, such decision would not affect the decision in this case because, under the facts averred, subdivision 4 is not applicable. We are thus thrown back solely upon the provisions of subdivision 1, under which an implied warranty does arise.

The next question is whether the existence of the express warranties, heretofore referred to, negatives the existence of an implied warranty of fitness. This question is clearly answered by subdivision 6 of section 15 of The Sales Act, 69 PS §124, which provides: "Sixth. An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith." There is no inconsistency between the two warranties in the case before us.

This ruling is not affected by section 71 of The Sales Act, 69 PS §332, which provides: "Where any right, duty, or liability would arise under a contract to sell or a sale, by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale. . . ."

In Bechtold v. Murray Ohio Manufacturing Co., 321 Pa. 423, the court applied section 71, because the con-

tract in that case expressly excluded "all other guaranties, warranties, obligations or liabilities, express or implied" and provided that "no claim for damages or labor sustained by the Purchaser on account of defective apparatus or otherwise, will be allowed." There are no such provisions in the contract before us, except as to claims for defective materials, and plaintiff's statement is not based on any such claim. There is not even a provision specifically excluding all agreements not contained in the writing, although we are of the opinion such a clause, if included, would not of itself have been sufficient to negative the existence of an implied warranty. See Hobart Manufacturing Co. v. Rodziewicz, supra. "If the parties wish to avoid the implied warranty, they must, in form or in substance, contract against it." See Bekkevold v. Potts et al., 173 Minn. 87, 59 A.L.R. 1164.

Having concluded that the averments of the statement of claim are sufficient to support an implied warranty, we next consider whether the limitations of numbered paragraph 4 of the contract apply to the warranties set forth in numbered paragraphs 1, 2, and 3. These four paragraphs have heretofore been quoted in full. It will be seen that they embody a guaranty of *suitability* and *performance*, as follows: by paragraph 1, that the press and equipment will be *suitable* to apply on a specified sheet of impressed asbestos cement "a total uniformly distributed pressure of 9,000 tons"; by paragraph 2, that, under such pressure, the maximum combined deflections of the platens will not exceed .012″; and by paragraph 3, that the various motions of the press and conveyor mechanism will be synchronized *in a semi-automatic fashion* and that the equipment will *function continuously* in the manner described.

According to the averments of the statement of claim, the press and equipment furnished by defendant did not measure up to this guaranty. They were

not suitable to do the required work and they failed to function continuously in the manner described. However, defendant contends that the limitations set forth in numbered paragraph 4 of the contract apply also to any breach of the warranties contained in paragraphs 1, 2, and 3; but we do not agree with that contention. Each of those four paragraphs deals with a specific guaranty. The first three embody no limiting provisions. The fourth states that the press and equipment "will be guaranteed against defects in materials and workmanship." In a certain sense it does not even belong under the leading sentence which reads, "The above equipment is guaranteed to *perform* as follows", whereas the first three paragraphs clearly do.

The first three limitations in paragraph 4 all relate clearly and exclusively to the subject matter of that paragraph, which is "defective material". Those words are expressly used in every sentence of the paragraph, and in connection with every limitation, except the last one. There is not the slightest suggestion that any of the limitations of liability relates back to the three preceding paragraphs, which deal with "performance" and "suitability". The final sentence of paragraph 4, however, reads as follows: "We shall not be held liable for any special, direct or consequential damages;" but there is no justification for holding that this sentence covers anything more than the subject matter of the paragraph of which it is a part, which is exclusively "defective material" and not "performance" or "suitability". If it had been defendant's intention that the sentence referred to was to have broader application, it should not have been included in and made a part of paragraph 4, especially so as the letter containing the paragraphs under discussion was prepared and written by defendant.

If the sentence referred to were held, by interpretation, to be applicable to the first three paragraphs, it would nullify them completely. In such event, even if

the machinery were not "suitable" and could not "perform" as described, there could be no redress, unless the default was occasioned by a defective part; but the whole matter of defective parts is completely covered by paragraph 4. The first three paragraphs having been inserted, it must be assumed they were intended to afford protection to the purchaser in addition to that afforded by paragraph 4. The very essence of plaintiff's position is that it is *not* claiming for defective materials or workmanship; it is claiming redress solely because of faulty and improper design and construction and lack of suitability and capacity for the intended use.

Defendant also contends plaintiff did not give notice in due time, as required by section 49 of The Sales Act, 69 PS §259, which provides:

"But if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty, within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor."

Plaintiff, however, has averred, in paragraphs 16, 20, and 25 of the statement of claim, that plaintiff made diligent investigation of the cause of each failure of the machine and that, as soon as plaintiff discovered what was really wrong with the press and equipment, namely, that it was improperly designed for the work it was intended to do, plaintiff promptly notified defendant it would be held liable. We do not see how any inference of laches can be drawn from those averments. The question is one of fact for a jury. If defendant desires more specific averments as to this, or any other matter raised by the statement of claim, it should take a rule to secure them.

Defendant further contends that plaintiff, if entitled to recover, can recover only "the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they

had answered to the warranty." But that particular provision of subdivision 7 of section 69 of The Sales Act, 69 PS §314, is restricted, by the language which precedes it, to breaches of warranty as to "quality". Subdivision 6 of section 69 of The Sales Act is applicable to the present case. It provides: "Sixth. The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty."

We are, therefore, of the opinion that the statement of claim sets forth a good cause of action.

And now, April 14, 1942, the questions of law, raised by defendant in its affidavit of defense, are ruled against defendant. Leave is granted to defendant either to file a rule for a more specific statement of claim within 10 days, or to file an affidavit of defense on the merits within 10 days, from date hereof.