KAUFMAN v. KATZ.

1. SALES—BARRELS—PROXIMATE CAUSE OF LOSS—QUESTION FOR JURY—EVIDENCE.

A question of fact for the jury was shown, in barrel buyer's action against seller for damages resulting from failure to supply plaintiff the kind of barrels contracted for and warranted for delivery, as to whether plaintiff's loss was traceable to defendant, where plaintiff's testimony shows barrels furnished had been previously used for containing condensed milk or chemicals and had been cleaned with warm water instead of steam or chlorine and an expert microbiologist testified that neither plaintiff's ingredients nor processing methods nor other reasons would cause the 64% spoilage of pickles which occurred in the course of plaintiff's operations.

2. SAME—DAMAGES—EVIDENCE.

Adequate proofs were presented in action against seller of barrels to establish that plaintiff sustained damages from spoilage of pickles in barrels furnished by defendant.

REFERENCES FOR POINTS IN HEADNOTES
[3, 4] 46 Am Jur, Sales § 313.
[5] 46 Am Jur. Sales § 353.

3. SAME—EXPRESS WARRANTY—INSTRUCTIONS—EVIDENCE.

Evidence presented in buyer's action against seller of barrels supported jury's verdict for plaintiff that defendant had made an express warranty that the used barrels furnished were suitable for the pickling business in which plaintiff was engaged, where instructions given with reference to what would amount to an express warranty were not objected to by defendant (CL 1948, § 440.12).

4. SAME—EXPRESS WARRANTY—EVIDENCE.

The positive statement by defendant seller to plaintiff buyer, that used barrels which latter was buying were proper and suitable for pickling and were clean was sufficient, under the circumstances, to support jury's verdict that an express warranty had been made (CL 1948, § 440.12).

5. SAME—IMPLIED WARRANTY—BUYER'S RELIANCE ON SELLER'S SKILL AND JUDGMENT.

An implied warranty that goods sold shall be reasonably fit for the purpose for which they were bought arises where the buyer makes known the particular purpose for which the goods are acquired and relies on the seller's skill or judgment as to the selection of such goods (CL 1948, § 440.15).

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted April 7, 1959. (Docket No. 2, Calendar No. 47,575.) Decided June 5, 1959.

Case by Irving S. Kaufman, doing business as Kaufman's Home Food Products, against Reuben L. Katz, doing business as American Barrel Company, for damages arising from food spoilage in processing containers furnished by defendant. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Cornelia Groefsema,* for plaintiff.

*Shapero & Shapero,* for defendant.

KAVANAGH, J. Plaintiff brought this action to recover damages for loss of customers, good will, and

spoilage of pickles. Plaintiff alleged these damages resulted from the failure of defendant to deliver to plaintiff the kind of barrels he contracted and warranted to deliver; that as a direct and proximate result of the delivery of the unclean and contaminated barrels, which were utterly unfit for use for the purpose for which they were sold and warranted, the pickles processed by plaintiff within the barrels spoiled.

Defendant by answer denied he warranted the barrels. He contended that he was a dealer in secondhand barrels and that plaintiff well knew this; that he delivered the kind of barrels ordered by plaintiff; that said barrels were purchased after inspection and after plaintiff advised they were what he desired. Defendant denied that secondhand barrels carried any warranty, express or implied, and further denied that the damages claimed by plaintiff were the proximate cause of anything defendant had done or any duty defendant had breached, and that any damages plaintiff suffered were due to his own negligence and lack of knowledge of how to process pickles.

The case was tried to a jury. Defendant moved for a directed verdict at the close of plaintiff's proofs for the following reasons:

(1) Plaintiff had failed to establish any contract of warranty.

(2) There is no implied warranty by a seller of secondhand articles.

(3) There is a complete failure of proof that the result complained of was occasioned by the barrels.

(4) The proof of damages is so highly speculative that there is no warrant for submission to the jury.

(5) The evidence in the case is that the barrels were made in accordance with the contract of manufacture, hence there is nothing to submit to the jury.

This motion was denied. Verdict of the jury in favor of plaintiff was in the amount of $12,106. Motion for judgment notwithstanding the verdict followed citing the same reasons given in the motion for a directed verdict. On denial of this motion, a motion for new trial was made for and on account of errors committed and because the judgment was against the great weight of the evidence and against the just rights of the defendant, claiming the court erred: (1) in refusing to direct a granted verdict in accordance with the motion at the end of plaintiff's proofs; (2) in admitting into the record sales slips of the plaintiff which were not disclosed to defendant on demand and upon order of pretrial court; (3) in permitting the testimony of the expert witness to go to the jury as a basis for speculating that the bacteria came from the barrels of defendant; (4) in permitting the jury to speculate as to how the pickles became spoiled. In denying the motion for new trial conditionally, judgment was reduced to $7,500.

In the motion for new trial defendant also stated that the jury verdict was against the great weight of the evidence in that the evidence is that the barrels complied with the contract of purchase; the income tax of plaintiff establishes that plaintiff suffered no damages as a result of the loss of pickles; the plaintiff used the barrels again and again without reparaffining, which an expert testified was a dangerous practice and contrary to the contract and warranty claim; there is no evidence that the germs were traceable to the barrels.

Upon denial of this motion for new trial, defendant appealed to this Court. Defendant raises 7 questions as follows:

(1) "Was defendant entitled to a directed verdict because the plaintiff failed to establish that the loss claimed was traceable to the defendant?

(2) "Was defendant entitled to a directed ' verdict because plaintiff's own records and proofs established conclusively that plaintiff did not suffer any loss?

(3) "Was defendant's statement that the barrels had been used by others in the pickling industry and were thus proper for that industry, an express warranty which could or should have been reasonably relied upon by the experienced plaintiff?

(4) "Is there an implied warranty on secondhand barrels?

(5) "Did plaintiff's failure to give any notice whatsoever of the alleged breach of warranty bar any recovery?

(6) "Was defendant entitled to a directed. verdict because the record shows that the proximate cause of the damage suffered, if any was suffered, was plaintiff's failure to control the activity of the microorganisms?

(7) "Was the verdict so against the great weight of evidence and the truth of plaintiff's testimony so highly improbable in light of the clearly established facts that a new trial should have been granted?"

Plaintiff had started in the pickle business as a full-time occupation on his own in the spring of 1951. Several years before he helped his father in the processing of pickles, working in every phase of the business except purchasing barrels. The purchase of barrels at that time was always carried on by his father. He left the pickling business for several years and worked at various jobs until after his father's death when he undertook his own operation of the pickling business.

In July, 1951, needing barrels, plaintiff went to the defendant Katz. Plaintiff advised defendant that the barrels were to be used for putting up kosher dill pickles, the barrels needed to be cleaned and paraffined, and he preferred a vinegar barrel. De-

fendant advised plaintiff that he had sold barrels to
other pickle manufacturers, knew what plaintiff
wanted, showed plaintiff the cleaning process which
he used, which included steam cleaning, and agreed
to furnish plaintiff the barrels he needed.

Defendant sold plaintiff 200 barrels, one half of
which were delivered August 18, 1951, and the other
half on August 31st of the same year. Plaintiff
examined the barrels after they were delivered and
they appeared to be paraffined. He rinsed them with
cold water and a cleaning product used by picklers
and placed pickles therein for processing. The pick-
les put up in plaintiff's barrels had a peculiar flavor
and became soft and hollow. Plaintiff tried respicing
them; he sorted them trying to salvage some. He
was unable to sell some of the pickles and those that
were sold were returned by his customers. Not
knowing that the barrels were causing the loss of
the pickles, he continued to use them during the 1951
season and began using them in the 1952 pickling
season when the deterioration of the pickles became
greater. The flavor was strange and medicinal.

In 1952 plaintiff sought the advice of Dr. Fred-
erick W. Fabian, a microbiologist of Michigan State
University. Dr. Fabian was of the opinion that the
spoilage of the pickles was due to the barrels. Dr.
Fabian testified that used barrels can be washed ef-
fectively with steam.

Defendant's witness and employee Harry Sheer
testified that defendant merely used warm water in
washing these used barrels contrary to the defend-
ant's representation to the plaintiff at the time he
contracted for them.

In answer to defendant's first question, Dr. Fabian
testified as follows:

"We observed that whenever we got this medicinal
flavor the barrel was dark on the outside. Now,

rightly or wrongly, we attributed this to the fact that the material had leaked through the barrel at some time and caused this blackening. It was a semi-char, something like you get when you put, for instance, sulphuric acid on wood; it turns it black. Now, we began to observe that—reading strictly from my notes here:

" 'Barrel Number 35 of night dills put up August 6, 1952—peculiar medicinal flavor. This flavor is present in all barrels which are black on the outside.'

"Evidently, the chemical in the barrel had some chemical which had reacted with wood to give it this black discoloration. Now, I wouldn't want to say what the chemical was but that is my opinion in the matter."

Dr. Fabian further testified as follows:

"*Q.* Did any of the cucumbers you tasted have a medicinal flavor which were in barrels that didn't have this black on the outside?

"*A.* None that we observed.

"*Q.* I see. Doctor, is there any one of these ingredients, which Mr. Kaufman has testified he put into these pickles, that which would account for that medicinal flavor you tasted?

"*A.* No. They are used year in and year out. They are used all over the world. These overnight dills are made practically the same way in Europe and everywhere. In fact, that is where we got them from."

Dr. Fabian also testified that all 15 of the barrels he tested upon one examination had pickles containing a medicinal flavor and all these same barrels had this black discoloring on the outside. Later the following questions and answers took place:

"*Q.* Doctor, from your tests and your examination and consideration of what Mr. Kaufman has testified he put into these pickles, have you formed an opinion as to the cause of the softness of the

pickles which you found to be soft, assuming Mr. Kaufman's testimony in this respect to be true?

"*A.* Yes.  I have formed an opinion.

"*Q.* And what is that opinion?

"*A.* I think that the spoilage in these pickles, which occurred in a very short period of time, was due to the use of these secondhand barrels.  I base that opinion on the evidence, bacteriological evidence, which we obtained and my previous experience with secondhand barrels.  *   *   *

"*Q.* Doctor, with respect to these pickles that had a medicinal flavor, and again assuming the truth of Mr. Kaufman's testimony as to the ingredients he put into the barrels and the examinations you made, do you have an opinion as to the cause of that medicinal flavor?

"*A.* I can see no other way but what it must have come from the barrel.

"*Q.* Is that your opinion?

"*A.* That is my opinion.

"*Q.* You don't know where else—it certainly couldn't come from the ingredients?

"*A.* I know of nowhere else it could come from.

"*Q.* Have you included in forming your opinion the assumption that these barrels had been paraffined?

"*A.* Yes."

Dr. Fabian also said plaintiff's experience, both prior to and since using the particular batch of barrels received from defendant, would indicate very strongly that those barrels caused the spoilage.  Dr. Fabian further testified there was nothing in plaintiff's processing that, in his opinion, could have caused the loss aside from the barrels.  In forming his opinion that defendant's barrels caused the spoilage, Dr. Fabian took into consideration the yeast and molds in the air.  Dr. Fabian said spoilage for the entire pickle industry averaged 5%, with plaintiff's average even lower, except for the pickles processed in defendant's barrels which averaged

64% spoilage. Dr. Fabian testified there was nothing in the ingredients plaintiff put into his pickles to account for the spoilage. Dr. Fabian also testified barrels could be properly cleaned and effectively made suitable for pickling either by boiling them in water or by the use of steam and chlorine.

J. Hue Arrington, plaintiff's witness who was employed by him as a cooper, testified as follows:

"*Q.* You say you also opened the barrels for him?

"*A.* I did. I recall the barrels that he purchased from Mr. Katz. I wasn't there when the barrels came in. I saw them after that time. I know the size of the barrels that were purchased from Mr. Katz. The first lot of barrels he got from Mr. Katz, they was mostly 55-gallon barrels and they was what is called a condensed milk barrel and that is what they were used for after they were made. They were used for condensed milk. After they were used for condensed milk my statement is that they was then used for chemical.

"*Q.* Did you observe that when you first saw the barrels?

"*A.* No, I did. When I first saw the barrels I knew that it was a condensed milk barrel. I knew that.

"*Q.* I see.

"*A.* And so I didn't think nothing but it was a milk barrel. I would say 150 of those barrels would run mostly 55-gallon milk barrels and 50 of those barrels was a 50-gallon barrel. Those 50-gallon barrels, those was painted jet black. I first saw them they were painted jet black. I didn't know what kind of barrels they were for this reason.

"*Q.* Do you know what kind of barrels the 50 that were painted black were?

"*A.* Yes, I do.

"*Q.* And did you know when you first saw them what kind of barrels they were?

"*A.* No, I didn't, for this reason. That type of barrel, as long as I have been in the coopering busi-

ness I have never seen that type of barrel used but for 2 purposes.

"*Q.* What purposes?

"*A.* That was for a juice, mostly orange juice, though sometimes they have other juices in them too but mostly for orange juice I have seen in those barrels and acid. I wouldn't say just how many of those 50 barrels were firwood barrels. I would say that a few firwoods were in that 50 and, of course, those particular 50 barrels is always painted blue. When they are used for acid they are painted blue and those barrels had been painted black and the onliest way I could tell that barrel had been painted blue was under the hoop. The top hoops you couldn't, you had to tell from the bilge hoops, under the bilge hoops you will find blue paint under those barrels and when I seen that I knew that that was an acid barrel. I didn't see that in no time right away. I can't recall to the exact time that I seen it but I didn't see it right away because Mr. Kaufman was having trouble with a chemical taste and I went out there one evening and he was standing in the door with his head down and he said to me—

"*Q.* Can you place the time that this occurrence happened with relation to some other events or to the date in any way?

"*A.* The time?

"*Q.* Do you know the time of day it was?

"*A.* Well, it was betwixt 5: 30 and 6 o'clock.

"*Q.* Do you know what month it was?

"*A.* No. I don't but this is what I did, I goes over to the barrels and I takes my knife and I cuts into the stave like this (indicating)—it's like I can't even cut paper.

"*The Court:* Don't cut your finger.

"*A.* It ain't sharp enough. I cut chips out of each stave and looked at the chips and I said, 'No wonder that they have a chemical taste because this is a chemical barrel.' He said, 'How do you know?' I said, 'I know from this.'

"*Mr. Shapero:* Just a minute.

"*Q.* Just a minute. You can't say.

"*A.* I know from that wood.

"*Q.* From the wood?

"*A.* Yes.

"*Q.* What in the wood or appearance of the wood—

"*A.* What I know about it, the chemical there in the wood turned the wood real dark. Maybe it will turn 4 or 5 staves real dark and maybe there will be 2 or 3 staves that probably has about just the right coloring and the next few staves it will probably turn them real dark. That chemical in the wood changes the colors of it and makes it just really dark. That is how I testified that was an acid barrel."

Defendant testified that he gave plaintiff only "Heinz" and "chopsuey" barrels. The Heinz barrels were described as whiskey barrels and the chop-suey barrels as soy bean barrels.

Certainly a question of fact for the jury was shown by the above testimony so that defendant was not entitled to a directed verdict because plaintiff failed to establish that the loss claimed was traceable to defendant.

The second question that plaintiff's own records and proofs established conclusively that plaintiff did not suffer a loss hardly needs answering. Suffice it to say that there were adequate proofs from which the jury could find the amount of damages.

Defendant's third contention is that his statements did not legally constitute an express warranty, but were rather mere statements of opinion which could or should not have been reasonably relied upon by plaintiff.

In addition to the above statement of defendant, plaintiff testified that he advised defendant that he wanted barrels that would be proper for him in his pickle business; that he told defendant that he, plaintiff, came to defendant with an open mind, just start-

ing in business, and that plaintiff would need help and would rely on defendant's experience with barrels to give him the proper barrels.

Defendant admits that plaintiff wanted barrels that were suitable for the pickling business and that he agreed to furnish them.

The uniform sales act (CL 1948, § 440.12 [Stat Ann § 19.252]) reads, in part, as follows:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

The jury apparently believed plaintiff's version of the testimony, as they had a right to do.

Whether an express warranty was proven was a matter for the jury to determine under proper instructions by the court as to what would legally amount to an express warranty. No objection to the instructions as given has been raised by defendant.

Defendant cites in his brief a number of cases outside of the State of Michigan which were dealing with questions of opinion and not relied upon by the buyer and were, therefore, not considered to create a warranty. Such were not the facts in the instant case. Therefore, these cases do not apply.

The positive statement by defendant that the barrels were proper and suitable for pickling and were clean could be found by a jury to amount to an express warranty.

Defendant cites 3 cases to support his position that there is no implied warranty of fitness on sec-

ondhand articles. The case of *Kirby* v. *Gibson Refrigerator Co.*, 274 Mich 395 (103 ALR 1343), did not involve secondhand merchandise and is not authority for this position. In the case of *Hysko* v. *Morawski*, 230 Mich 221, plaintiff claimed to have rescinded a contract for the purchase of certain used pool tables and equipment and brought suit for the money paid. The Supreme Court found that plaintiff had offered sufficient proof to go to the jury on the basis of fraud and the trial court had erred in directing a verdict. The question of implied warranty was not involved. The third case relied upon by defendant is *Bayer* v. *Winton Motor Car Co.*, 194 Mich 222. The cause of action in this case arose before passage of the uniform sales act and the case at most holds that there can be no implied warranty of fitness with reference to used machinery.

The uniform sales act (CL 1948, § 440.15 [Stat Ann § 19.255]) provides, in part, as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose. * * *

"(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith."

The overwhelming number of States that have adopted the uniform sales act have held that there are implied warranties with respect to used goods.

The authorities on this subject are collected in an annotation in 151 ALR 446, 464.*

We think the trial court properly instructed the jury with respect to implied warranty when he stated as follows:

"I am further requested to charge you, members of the jury, and do so charge you, that where a buyer makes known the particular purpose for which goods are acquired and relies on the seller's skill or judgment as to the selection of such goods, there is an implied warranty that the goods shall be reasonably fit for that purpose."

Incidentally, no objection to this charge was made by defendant's counsel.

We think this was a correct statement of the law as applied to the barrels in this case.

The other questions raised by defendant directed to the weight of the evidence and the improbability of the testimony and as to the cause of the spoilage and plaintiff's failure to give notice, in view of the above facts, do not require further answer.

The judgment in favor of plaintiff is affirmed. Plaintiff may have costs.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, EDWARDS, and VOELKER, JJ., concurred.

---

* *Drumar Mining Co.* v. *Morris Ravine Mining Co.*, 33 Cal App2d 492 (92 P2d 424); *Moss* v. *Yount*, 296 Ky 415 (177 SW2d 372, 151 ALR 441); *E. Edelman & Co.* v. *Queen Stove Works*, 205 Minn 7 (284 NW 838); *McKeage Machinery Co.* v. *Osborne & Sexton Machinery Co.*, 124 Pa Super 387 (188 A 543); *Weber Iron & Steel Co.* v. *Wright*, 14 Tenn App 451.