## NELS C. PETERSON v. FIRST NATIONAL BANK OF CEYLON AND OTHERS.[1]

March 27, 1925.

No. 24,413.

**Equitable relief against error.**

1. In considering the competency of equity to relief against mistake, it is not controlling that the initial error is one of law rather than fact. It is not so much the genesis of the error as it is its unintended and unconscionable effect upon legal rights and obligations that makes a cause for relief.

**Court has jurisdiction to set aside foreclosure which would result in unconscionable advantage for judgment and attaching creditors.**

2. Plaintiff employed an attorney to foreclose by advertisement, intending to hold and enforce the security for the full amount of the mortgage debt, approximately $15,000. The default justifying foreclosure was in the payment of a $722.40 installment of interest. The principal was not due, but the mortgage contained the usual provision for accelerating the maturity of the whole debt upon any minor default. Even without such a clause, the proceeds of the sale could have been applied on the unmatured principal. Solely because of a blunder of his attorney, the property was sold for $835.50 (it was worth $21,000), and the mortgagee thereby put in danger of losing his entire security for that sum. In fact, defendants are attempting, through redemption proceedings, deliberately to take an unconscionable advantage of plaintiff's mistake, with full knowledge of which they have proceeded. Plaintiff is blameless, defendants are guilty of

[1]Reported in 203 N. W. 53.

inequitable conduct, and, unless prevented, will unjustly enrich themselves at the expense of plaintiff, and the court can put all the parties in statu quo without legal injury to any. *Held*, to be within the equitable powers of the district court to set aside the foreclosure sale, reinstate the mortgage and provide for its foreclosure anew, adequate provision being made to protect defendant redemptioners against loss by reason of their redemptions.

*Headnote 1. See Equity, 21 C. J. p. 96, § 69.
Headnote 2. See Mortgages, 27 Cyc. pp. 1506, 1511 (1926 Anno).

Action in the district court for Freeborn county to reinstate a mortgage, declare the debt a specific lien and for other relief. The case was tried before Peterson, J., who ordered judgment in favor of plaintiff. Defendants appealed from an order denying their motion for a new trial. Affirmed.

*Frank E. Dougherty* and *Allen & Allen,* for appellants.

*Stevens & Stevens, Henry A. Morgan* and *Meighen, Knudson & Sturtz,* for respondent.


STONE, J.

Action by the mortgagee and purchaser at the sale under foreclosure by advertisement to reinstate a mortgage and for additional relief. After a decision for plaintiff, certain defendants appeal from the denial of their motion for a new trial and an order appointing a receiver of the rents and profits of the mortgaged real estate.

The farm in question is a quarter section which for many years was the home of plaintiff and his family. It is worth $21,000. It was sold in 1919 and conveyance made to the purchasers, defendants Beneke, on March 1, 1920. Plaintiff took back a purchase money mortgage for $14,400. The Benekes went into and remain in possession. They paid the first year's interest, but defaulted in the next instalment of $722.40. Promptly, ignorant of the procedure but intending to enforce his security to the utmost, plaintiff employed attorneys to foreclose.

Here the trouble commenced. The law firm retained placed the matter in charge of a junior member who, unfortunately, was guilty of the "inadvertence and mistake" upon which plaintiff's prayer

for relief is predicated.  He did not discover and make use of the clause in the mortgage permitting the maturing of the entire debt upon any default.  Carelessly, he seems to have assumed its absence.  He did not know that, in the absence of such a clause, under the rule of Fowler v. Johnson, 26 Minn. 338, 3 N. W. 986, 6 N. W. 486 (see also Kleinman v. Neubert, 142 Minn. 424, 172 N. W. 315, and Hage v. Drake Marble & Tile Co. 145 Minn. 113, 176 N. W. 192), he could, for default in an installment, sell for any larger amount and use the proceeds, so far as needed, to pay the unmatured portion of the debt.  Mistaken thus in fact about the acceleration clause, mistaken also as to the law of foreclosure and somehow supposing that successive foreclosure sales could be had (even without redemption and under the same mortgage), of the same property for successive installments of principal and interest, the young attorney foreclosed and sold for only the interest then delinquent.  The property was bid in for plaintiff by his attorney at the sale on June 10, 1922, for only $835.50.  Thus, plaintiff through the action of his attorney, which he would have prevented had he possessed any real knowledge of what was going on, was put in the way of losing for $835.50 the ample security for his claim of $15,000, which minus the mortgage is worthless.

The Benekes, purchasers and mortgagors, found their venture a losing one.  Desiring to save what they could out of the wreck of their fortunes, in September, 1922, they traded their equity to their codefendant, Ceylon Motor Company (hereinafter referred to as the motor company), which took a quitclaim deed of the farm in exchange for a bill of sale of certain automobiles and motor trucks upon which, however, it took back a chattel mortgage for $940. The value of the autos over and above the mortgage was about $1,000.

The motor company was a losing venture then being liquidated by defendants Koenecke and Alton.  Koenecke was the cashier of defendant First National Bank of Ceylon, a creditor of the motor company for a substantial amount, for which it then held an attachment covering most of the machines traded to the Benekes.  All of the facts concerning the motor company were known to the other

defendants when the Beneke deal was made and all of the defendants then:

"believed that the mortgage still remained a lien upon the farm for the full amount of the principal, interest and foreclosure costs and that upon a redemption by the Ceylon Motor Company, this full amount would have to be paid to the mortgagee in order to free the farm from encumbrance. They all understood that the value of the farm was large enough to leave a substantial equity after paying the principal, interest and foreclosure costs and contemplated that all these would be paid out of the land and that none thereof would become a mere unsecured personal debt of the Benekes."

In other words, the trade to the motor company was made subject to plaintiff's mortgage and its foreclosure and all the defendants supposed that the mortgage remained a lien, not for the paltry $835.50 actually bid at the foreclosure sale, but for the entire mortgage debt, with costs of foreclosure, more than $15,000. And the intention was that a redemption by the motor company would effect its payment to plaintiff, thereby discharging the Benekes from the obligation of the mortgage notes.

The Beneke-Motor Company trade was conducted in good faith. But, from that point on, the findings convict the appealing defendants of bad faith and grossly inequitable conduct. Speedily discovering the nature of the blunder made by plaintiff's attorney and its apparently fatal effect on his mortgage, they proceeded thereafter with the deliberate purpose of taking advantage of that blunder and of compelling plaintiff to part with a $15,000 security for $835.50.

The exact finding on that point is this:

"On or about the first day of October, 1922, the defendants, Ceylon Motor Company, F. W. Koenecke and the First National Bank of Ceylon, discovered and knew that a mistake had been made by the plaintiff in the sale of the land in question, under said foreclosure, whereby the land had been bid in in the plaintiff's name for the sum equal to one year's interest and the costs of foreclosure and that thereafter the said three defendants concertedly and jointly

sought to take unconscionable advantage of plaintiff's mistake for the purpose of obtaining the title to said land in the name of the said Koenecke, in order that they might enrich one or more of them to the extent of the value of said land and to the exclusion of plaintiff's mortgage and to unconscionably and unfairly deprive the plaintiff of his security on said land to the extent of more than $14,400."

Defendant First National Bank of Ceylon, as its creditor, was already in a position to redeem if the motor company did not. Not satisfied with the one opportunity to get the farm for almost nothing, defendant Koenecke took the additional precaution of commencing three separate actions against the motor company and in each of them procuring an attachment—on an affidavit found to be "wholly false and without foundation." His purpose was to make sure of the intended "unconscionable advantage" of the blunder in the foreclosure. It may have been that the motor company had little or no defense to these new suits. But one of them was for $3,000, claimed to be due Koenecke himself for personal services and it was seen to by someone that the claims were not resisted.

The next pertinent finding is this:

"In further pursuance of said joint plan the bank filed a senior notice to redeem based upon its judgment, Koenecke filed notices to redeem based upon the liens of the attachments, and the Motor Company did not redeem. In so doing they all knew and appreciated that their plan was in direct violation of the trade with the Benekes and was calculated, contrary to the agreement and understanding upon which the trade with the Benekes was based, to leave the note unsecured by the land and a mere personal liability of the Benekes; and they all further knew and appreciated they were taking an unconscionable advantage of the mistakes in the foreclosure."

The motor company failing to redeem, the First National Bank redeemed on June 14, 1923, paying the sheriff $884.67. On June 20, 1923, Koenecke redeemed from the bank. The foreclosure and

redemptions are regular in form so that, as matters stand now, Koenecke holds the legal and record title and defendants Beneke are in possession under a lease from him.

. This action was commenced in June, 1923, and its purpose will be effected by the decision, unless there is a reversal or modification, to the extent that the foreclosure and redemption proceedings will be vacated, the mortgage reinstated as a lien and its foreclosure anew decreed. Provision is made for placing the defendant redemptioners in statu quo, the whole purpose being to restore all the parties to the position they would occupy had there been no attempt at foreclosure and to permit plaintiff to foreclose anew in the present action.

The problem is whether, in view of what followed, equity can relieve plaintiff against the blunder of his attorney, a unilateral mistake of fact and law combined. It is a difficult question and upon the answer depends most of the accumulations of one citizen's lifetime.

The error was not one in the conduct of litigation. The distinction is important for "a special public policy governs the case of mistake of law or of practice in the conduct of causes * * * 'interest reipublicae ut litium finis sit.' " 1 Story, Eq. Jur. (14th ed.) 172, note. "If a mistake in practice * * * furnished reasons for a new trial, it would encourage litigation and reward ignorance and carelessness at the expense of the other party; and therefore, our law in such cases wisely acts upon the maxim * * * it is for the public good that there be an end to litigation." Broom, Legal Maxims (8th Am. ed.) 331. The need for settlement and finality is present, but not so urgent in transactions of private concern.

It should be observed also that the considerations controlling this decision have "no application to cases of compromise, where doubts have arisen as to the rights of parties and they have intentionally entered into an arrangement for the purpose of compromising and settling these doubts. Such compromises, whether involving mistakes of law or of fact, are governed by special considerations." Pomeroy, Eq. Jur. (3d ed.) § 849. This principle was referred to in Gerdine v. Menage, 41 Minn. 417 (421), 43 N. W. 91.

Compare Richardson v. C. M. & St. P. Ry. Co. 157 Minn. 474, 196 N. W. 643.

Two other preliminary observations are to be made—first that the plaintiff himself is acquitted of negligence by a finding so supported by evidence as to be conclusive upon us. The other is that none of the defendants will suffer from the decision under review, except as they are denied an unconscionable advantage. As to all of the defendants, particularly those who have appealed, the status quo will be restored. On their own commendably frank testimonial admissions, they will have every benefit and advantage expected from the original transaction between the Benekes and the motor company. It is therefore too clear for sincere question that the relief below accomplishes simple justice. We affirm, for the equity of the case is clear.

There is much authority for the proposition that no relief can be had from mistakes of law, but that doctrine has yielded much to the demand that justice be not obstructed by obsolete and baseless distinctions—useless duffle of an older and more arbitrary day. It is impossible to review here much of the literature on the subject. The rate of its output has not lessened since 1850 and even then a learned court refused to "swell" an opinion "with an examination of the great number of cases which have been decided, bearing on this question, and which, from their number as well as their contrariety, serve rather to bewilder than enlighten an inquirer for a stable and correct principle of decision." Stone v. Hale, 17 Ala. 557, 562, 52 Am. Dec. 185.

The idea that equity has no relief from mistakes of law had its origin in the almost humorous and wholly supposititious presumption that all know the law—a proposition contrary to both law and sense. There has been misuse also of the rule that ignorance of the law excuses no one. There is such a rule, but it goes only to the extent of making legal duty inescapable because of the subject's ignorance of the law. Neither in letter, spirit nor purpose does it justify or even suggest that a loss should be imposed on one and an unconscionable gain permitted another merely because of the former's ignorance of law.

The distinction so often made between mistakes of fact and those of law is artificial because, whatever its genesis, mistake is relieved against, not because of what it is but what it does. Mistake either of law or of fact, is of no moment until of factual effect, e. g., the prevention of a genuine contractual consent as distinguished from one that is only apparent. An error concerning a deed, whether mutual or unilateral, may be, in origin, solely of law, as an erroneous notion of the legal effect of language upon which both parties have agreed with deliberation. But, if the result be a conveyance of an estate or the imposition of an obligation not intended, the mistake, originating in matter of law, ultimates in serious and unintended fact—as it did in Houston v. N. P. Ry. Co. 109 Minn. 273, 123 N. W. 922, 18 Ann. Cas. 325.

So it has come about that we refuse to consider always controlling the distinction between mistakes of fact and those of law, and with us "it is settled" that in a proper case there may be relief from even unilateral mistake of law. Truesdale v. Sidle, 65 Minn. 315, 67 N. W. 1004, citing Benson v. Markoe, 37 Minn. 30, 33 N. W. 38, 5 Am St. 816, 57 N. W. 132, 43 Am. St. 508, and Lane v. Holmes, 55 Minn. 379, 57 N. W. 132. "It is impossible to coordinate the cases so as to produce satisfactory results, because the rule itself distinguishing mistake of law from mistake of fact is founded on no sound principle. * * * The only way apparent for the law on the subject to obtain uniformity and certainty is by the gradual broadening of these exceptions (in favor of relief from mistakes of law) until they so far coalesce that courts will venture to put mistakes of law and of fact on the same footing." Williston, Contracts, § 1581. The same learned author says also (section 1583), that the civil law countries have done away with the distinction between mistakes of law and mistakes of fact; that it is ignored in Germany, France and Italy and abolished by statute in California, Montana, North Dakota, Oklahoma, South Dakota and Georgia. Id. § 1582.

Another distinguished textwriter, opposing the notion that there is any real distinction between mistakes of law and mistakes of fact, denies that there is any "public policy which demands that one

who has done no injury, but simply seeks to avert a loss, shall, because of his ignorance of the law, suffer a loss." Keener, Quasi-Contracts, p. 91.

In matters of contract, equity prevents one from taking unconscionable advantage of another's mistake. "Even a clearly established negligence may not of itself be sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby." Buckley v. Patterson, 39 Minn. 250, 39 N. W. 490. See also C. H. Young Co. v. Springer, 113 Minn. 382, 129 N. W. 773.

Benson v. Markoe, supra, is an instructive example of the willingness which should be indulged to prevent one from unconscionably enriching himself through the mistake of another. There, as here, the plaintiff was blameless and the defendant in no position to invoke equitable protection, the error relieved against being an erroneous notion of the "legal effect" of a deed—in origin, a mistake of law but in result on legal rights, one of fact. The mistake of law was of no moment, except for its result upon facts of ownership and obligation. So in Lane v. Holmes, 55 Minn. 379, 57 N. W. 132, 43 Am. St. 508 (an action commenced a year after the expiration of the period of redemption), this court had no difficulty in setting aside a first foreclosure sale, reinstating the mortgage and ordering another sale—this, too, at the instance of the mortgagee who was also the purchaser at the first sale. The mistake relieved against was that alone of the mortgagee and his attorney (interest having been included where none had accrued), and was, so the court thought, "of law, pure and simple." Yet equity had a remedy, because the adverse party was seeking to avail himself of the opportunities offered by the mistake to enforce an unconscionable advantage. That, it was held, could not be done when the other party "was not blameable" and the status quo could be restored. Compare Swedesboro Loan & B. Assn. v. Gans, 65 N. J. Eq. 132, 55 Atl. 82, (summarized at 109 Minn. 283, 123 N. W. 925), another case, wherein there was no hesitation in setting aside the cancelation of a mortgage due solely to mistake of the mortgagee.

Stone v. Hale, supra, is directly and most interestingly in point. The complainant had employed an attorney to draw a trust deed

of certain slaves. Solely through his error, a controlling limitation was omitted from the deed. Years afterward, equity was willing to correct the error as against those who, having no equity superior to that of the beneficiary of the trust, sought to take an unconscionable advantage of the situation. To have done otherwise, the court thought, "would be, in the language of Judge Story, 'to allow an act, originating in innocence, to operate ultimately as a fraud, by enabling the party who receives the benefit of the mistake to resist the claims of justice under the shelter of a rule framed to promote it.'" To go further into the case law would ignore the commendable example of the Alabama court and "swell" this opinion unduly.

Defendants urge that they are being deprived of their vested legal rights as redemptioners. The answer is that the right they assert is not one which can be acquired by consciously taking advantage of the obvious blunder of another. It is not protected against the vitiating effect of the inequitable conduct out of which it sprung. There is a taint of heredity which denies it the inheritance of legal protection which it might otherwise possess. In such a case, this court will not permit a naked legal right to be used as the instrument of injustice and the means of depriving another of a clear and dominant equitable right.

The case is not altered by the fact that a statutory process (foreclosure and redemption), rather than a deed, has been the conduit of title. The operation is still that of conveyance and its particular form does not immunize it from equitable remedy. It is a conveyance which plaintiff was under no legal or moral obligation to make "and which the grantee, in good conscience, has no right to retain." In consequence, "a court of chancery will interfere and correct that mistake, whether it arose from a misapprehension of the facts, or of the legal operation of the deed." Stedwell v. Anderson, 21 Conn. 139, as quoted in Benson v. Markoe, supra. No defendant here has any "equities * * * which will permit him to reap the benefits of the complainant's honest mistake." Vliet v. Cowenhoven, 83 N. J. Eq. 235, 90 Atl. 680.

The controlling equities of this case are these: (1) A blameless plaintiff fallen into serious error, whether of fact or law is immaterial, which promises a disastrous result, wholly unintended by any of the parties to the transaction wherein the mistake occurred; (2) absence of negligence of the person seeking relief; (3) defendants with knowledge of the mistake attempting to secure by inequitable conduct an unconscionable advantage of plaintiff and to enrich themselves unjustly at his expense; (4) the ability of the court to restore the status quo as to all of the interests involved. Those considerations justify relief from unilateral mistake—cautious as courts must be in such a case. It is but "obvious justice that mistake by one party and knowledge of the mistake by the other, will justify relief as fully as mutual mistake." Williston, Contracts, § 1497. "All the cases which deny a remedy for mere mistake of law on one side are careful to add the qualification that there must be no improper conduct on the other." Haviland v. Willets, 141 N. Y. 35 (50), 35 N. E. 958, 960.

Both of the orders appealed from must be affirmed.

So ordered.