Max WINTER, et al., PJ Acquisition
Corporation, Respondents,

v.

John C. SKOGLUND, et al.,
Appellants, Respondents,

First National Bank of Minneapolis, et
al., Defendants, Appellants.

Nos. C5–86–637, C7–86–848.

Supreme Court of Minnesota.

April 17, 1987.

Rehearing Denied May 27, 1987.

Joe A. Walters, Lawrence A.G. Maloney, Corey J. Ayling, Minneapolis, for John C. Skoglund.

Eric J. Magnuson, Minneapolis, for First Nat. Bank of Minneapolis.

Leonard J. Keyes, David C. Forsberg, Richard C. Mark, Michael H. Streater, St. Paul, for Max Winter, et al.

Jerome P. Simon, Geoffrey P. Jorpe, St. Paul, for PJ Acquisition.

## OPINION

SCOTT, Justice.

Max Winter, his three daughters, and PJ Acquisition Corporation brought a declaratory judgment action to establish the invalidity of a March 21, 1984, instrument, which purported to subject Winter's Class B voting stock of Vikings II, Inc., to a right of first refusal. The defendants, Vikings II, Inc., and the other holders of legal or beneficial interests in Vikings II, Inc., Class B voting stock, counterclaimed. They sought specific enforcement of the rights of first refusal purportedly provided in both the March 21, 1984, instrument and in a December, 1977, instrument.

In a bifurcated trial, the district court, sitting without a jury, found that neither the 1984 nor the 1977 instrument created an enforceable right of first refusal and, therefore, concluded that Winter and his daughters could sell their Vikings II stock to PJ Acquisition Corporation without first offering it to either the corporation or the other holders of voting stock. The defendants' post-trial motions were denied and judgment was entered pursuant to Minn.R. Civ.P. 54.02.

The defendants appealed, and this court granted accelerated review. We affirm.

Minnesota Pro Football, Inc., now Minnesota Vikings Football Club, Inc. (Vikings I), was incorporated and acquired a National Football League (NFL) franchise in 1960. The original shareholders of Vikings I were Max Winter, E.W. Boyer, H.P. Skoglund,

Northwest Publications Inc., and Oluf Haugsrud.

In January, 1970, Winter, Boyer, and H.P. Skoglund entered into a voting trust agreement. Apparently the parties voted in concert with respect to managing the corporation and electing directors, but the voting trust was never formally implemented.

In September, 1970, Boyer transferred his voting stock to an inter vivos trust of which he was the settlor and a trustee. When Boyer died in 1973, his shares were then registered in the name of the First National Bank, "as Trustee of the E. William Boyer Living Revocable Trust Agreement dated September 30, 1970, as said agreement may thereafter have been amended by E. William Boyer during his lifetime."[1] John Steele, Boyer's son-in-law, succeeded Boyer as an officer and director of Vikings I and voted the stock held by the Boyer trust.

In 1977, Northwest Publications, Inc., which had increased the percentage of its publicly held shares, had to divest itself of its Vikings I stock because NFL rules barred substantial ownership of a franchise by a publicly held corporation. Winter and H.P. Skoglund borrowed three million dollars to buy Northwest's Vikings I stock. Following this transaction, Winter and Skoglund each owned 350 voting shares of Vikings I; 200 voting shares were held in the name of First National Bank of Minneapolis, as the Boyer trustee; and 100 voting shares were held by the Haugsrud trustees.[2]

Vikings II was then formed, and that corporation acquired the Vikings I stock held by the Haugsrud trustees. On September 29, 1977, Winter, H.P. Skoglund, Vikings II, and First National Bank of Minneapolis, as the Boyer trustee, requested rulings from the Internal Revenue Service with respect to the tax consequences of certain proposed transactions designed to vest in Vikings II ownership of 100 percent of the voting shares of Vikings I and 80 percent of the Vikings I non-voting shares.

In December, 1977, Winter, the Estate of H.P. Skoglund and John Skoglund,[3] and First National Bank of Minneapolis, as trustee of the Boyer trusts, entered into an agreement in which the parties agreed to use their best efforts to carry out the transactions described in the revenue ruling request so that Vikings II would become the holder of all of the voting shares of Vikings I and so that Winter, the Boyer trust, and the Skoglund interests would each own one-third of the 600 Vikings II voting shares.

The 1977 agreement also provided a right of first refusal with respect to voting shares of Vikings I and Vikings II exercisable by holders of voting shares. Transfers within a family and transfers occasioned by the death of the holder were exempted. The agreement also provided that the restrictions against sale or transfer embodied in the right of first refusal should be noted as a legend on the certificates representing Class B voting shares, and the parties were to surrender their certificates for that purpose. The legend does not appear on the certificates issued by Vikings I or on those subsequently issued by Vikings II.

1. E. William Boyer died on February 19, 1973. The E. William Boyer Living Revocable Trust Agreement of September 30, 1970, as amended, named E. William Boyer and Thomas Vennum as trustees. The trust instrument also provided that, upon Boyer's death, First National Bank of Minneapolis and Dorothy Lee Boyer should serve as trustees with Vennum. Mrs. Boyer accepted the appointment as trustee on February 27, 1973, and the First National Bank's acceptance was dated February 28, 1973. At the direction of counsel for the trustees, a certificate representing 200 Class B voting shares issued on March 6, 1973, named only First National Bank, as trustee, as owner.

2. Margaret Haugsrud and Northern City National Bank of Duluth were trustees under the last will and testament of Oluf Haugsrud, deceased.

3. H.P. Skoglund died on November 5, 1977, prior to issuance of the requested revenue ruling. His widow, Margaret H. Skoglund, was named executrix of his will, in which his son, John Skoglund, was designated the specific legatee of H.P. Skoglund's Class B voting shares of Vikings I. The Estate of H.P. Skoglund and John Skoglund, frequently referred to as the Skoglund interests, are consistently treated in this and other agreements as a single party.

The agreement also contained this provision:

This Agreement may be executed in counterparts and each counterpart shall be deemed an original hereof. It is further understood and agreed that this agreement shall be binding upon and inure to the benefit of those parties who are signatory hereto, whether or not executed by all parties.

The agreement was executed by Max Winter, by Margaret H. Skoglund, as the representative of the H.P. Skoglund Estate, by John Skoglund, and by First National Bank of Minneapolis, as trustee of E. William Boyer Living Revocable Trust Agreement dated September 20 [sic] 1970, as said agreement may thereafter have been amended by E. William Boyer during his lifetime.

A favorable revenue ruling was issued on October 27, 1978, and the holders of the voting shares of Vikings I transferred their shares to Vikings II. Certificates representing Class B common (voting) shares of Vikings II, Inc., were issued to: Max Winter, 200 shares; the Estate of H.P. Skoglund, 200 shares; First National Bank of Minneapolis as Trustee of the E. William Boyer Marital Trust under Agreement dated September 30, 1979, 106 shares; and First National Bank of Minneapolis, as Trustee of the E. William Boyer Residuary Trust under Agreement dated September 30, 1979, 94 shares. Legends describing the two classes of shares and whether they were voting or non-voting and noting that the shares had not been registered under the Securities Act of 1933 were affixed to these certificates.[4] The certificates do not bear notice of any right of first refusal.

Max Winter, John Steele, Jr., John Skoglund, Sheldon Kaplan, and Michael Lynn III became the directors of Vikings II, Inc. Winter was elected president of Vikings II, Steele was vice president, Skoglund was treasurer, and Sheldon Kaplan was the secretary. In March of 1984, when these officers and directors of Vikings II were in Hawaii for an NFL meeting, Winter declared that he "needed protection," and Sheldon Kaplan proposed an agreement providing a right of first refusal with respect to the sale of voting shares. During the discussions regarding this agreement, Barbara Boyer Steele pointed out that the parties already had such an agreement. There was testimony that John Skoglund and John Steele also commented on an existing agreement for a right of first refusal. Nevertheless, on March 21, 1984, Winter, Skoglund,[5] and the Steeles entered into an agreement which provided for a right of first refusal in Vikings II and, if Vikings II did not exercise it, a right of first refusal in the other holders of voting stock.

Included in the agreement is this provision:

WHEREAS, it is understood that the obligations and commitments of Steeles with respect to the Boyer Trust as expressed herein are subject to the approval and agreement of the trustees of those trusts and that the joinder of Steeles herein is only a covenant on their part to use their best efforts to have said trustees so commit and agree[.]

A day or two later Lynn asked Winter to extend and revise Lynn's employment contract. Winter refused to discuss the matter and suggested that it could wait until his return to Minnesota. In early April, without notifying Winter, Lynn arranged an unscheduled meeting with the other directors in Miami. Lynn secured the signatures of Skoglund and Steele to Lynn's prepared minutes of action of the directors recording the following actions: election of officers; increase in Skoglund's and Steele's compensation; and revision of Lynn's employment contract. Skoglund and Steele also called a special directors' meeting to be held in Dallas on April 10, 1984. Armed with the minutes of action and the notice of the special meeting, Lynn flew to Hawaii to demand Winter's concur-

---

**4.** In 1982 a legend that transfer is invalid without the approval of the Minneapolis City Council was added.

**5.** Margaret Skoglund, personal representative of the Estate of H.P. Skoglund, had assigned the 200 voting shares registered in the name of the estate to John C. Skoglund on July 8, 1983.

rence. After Lynn agreed to a provision assuring Winter's retention as president without reduction in compensation for as long as he is able to perform the duties of his office, Winter signed the minutes of action. From this time, Winter's role in the management of the Vikings was diminished.

On October 12, 1985, following a period of what Winter characterizes as profound alienation from the other officers and directors, he and his family entered into an agreement with PJ Acquisition for the sale of all Winter's Class B voting shares and his daughters' Class A non-voting shares.[6] After announcement of the sale of the Winter shares, the Boyer trustees executed a formal confirmation of the March 21, 1984, agreement.

The issue is: Did either the 1984 or the 1977 instrument subject Winter's voting shares of Vikings II to a right of first refusal?

■ The appellants mount a four-pronged attack on the trial court's determination that the document of March 21, 1984, is invalid, unenforceable, and not binding on Winter. First, they contend that the trial court's conclusion rests on a discredited common law doctrine—mutuality of obligation. The court's conclusion, however, was not that the contract was unenforceable because of lack of mutuality of obligation but rather that because of the absence of the mutual assent essential to form a contract, there was no contract for a right of first refusal made on March 21, 1984. Because no contract was formed, there were no mutual obligations.

■ Second, the appellants attack as clearly erroneous the trial court's finding that the parties intended that all or none of the voting shares be subject to a right of first refusal. We do not so regard it. The trial court found as fact that the purpose of the March 21, 1984, agreement, "to provide for rights of first refusal in the event any of the holders of voting stock of Vikings II, Inc. desire to sell, transfer or otherwise dispose of all or any of their shares of voting stock of Vikings II, Inc.," could not be achieved unless *all* of the holders of voting shares were bound by the agreement. He found that John Steele was not authorized to act as an agent of the Boyer trustees and that the signatures of the Steeles did not bind the trusts—facts expressly recognized in the agreement itself. The trial court also found that the parties to the March 21, 1984, agreement intended that the agreement of the Boyer trustees be a condition precedent to the enforceability of a right of first refusal against any of the parties.

■ Relying on voting trust agreements of January 13, 1970, and March 7, 1980, the appellants also insist, despite the language to the contrary in the March 21, 1984 instrument, that John Steele's signature binds the Boyer trusts. As we noted earlier, however, these voting trusts were never implemented within the contemplation of Minn.Stat. § 302A.453 (1986). The best that can be said of the voting trust is that the parties honored it as a shareholder voting agreement pursuant to Minn.Stat. § 302A.455 (1986). Steele held the Boyer trustees' proxy that authorized him to vote the Boyer trusts' shares, thereby permitting him to carry out the purpose of the voting trust—the continuity of the management of Vikings II. The proxy, however, can hardly be construed to authorize exercise of any of the attributes of ownership other than voting the shares. Whether Steele intended to act as a voting trustee or as the holder of the Boyer proxy, he had no authority to encumber the Boyer trusts' shares with a right of first refusal.

Indeed, the Steeles did not purport to bind the Boyer trustees but undertook only to use their best efforts to have the trustees agree to the right of first refusal, an undertaking which the trial court found was breached. Moreover, counsel for the Boyer trustees advised the Steeles before they signed the document not only that they were not authorized to bind the Boyer trusts but also that he would recommend to

---

**6.** Although the Class A non-voting shares are registered in Max Winter's name, each of Winter's three daughters is the beneficial owner of 200 shares.

the trustees that they not encumber the shares and limit their marketability by agreeing to a right of first refusal—a recommendation which the Steeles did not disclose to the other signatories.

We recognize the general rule that absent testimony of an intention not to be bound until the instrument is signed by others or an agreement to such effect, a party who signs and delivers an instrument is bound by the obligation he therein assumes. *Naylor v. Stene*, 96 Minn. 57, 104 N.W. 685 (1905). We also recognize that, as a practical matter, a right of first refusal imposes a significant burden on the marketability of corporate shares, and that when some, but not all, of the shares of a corporation are so burdened, both the marketability and the market value of the unencumbered shares may be enhanced. Furthermore, John Skoglund testified that he intended that the Boyer stock, as well as that held by Winter and Skoglund be subject to the right of first refusal. On the record before us, we cannot say that the trial court's findings that the stated purpose of the March 21, 1984, agreement could not be achieved unless all of the holders of voting stock were bound and that the parties intended approval of the Boyer trustees to be a condition precedent to the enforceability of the instrument against any party are clearly erroneous.

■ Appellants also claim that Winter is estopped from contesting the enforceability of the March 1984 agreement. While it is true that the trial court made no express findings with respect to appellants' estoppel defenses, it is also true that there simply is no evidence that Winter made any misrepresentations upon which any party relied to his detriment.

■ Finally, the appellants contend that the "memorial" executed by the Boyer trustees on October 14 and 15, 1985, is a ratification relating back to March 21, 1984. Steele did not purport to act as agent for the Boyer trustees, and inasmuch as the trial court found that the approval of the Boyer trustees was a condition precedent to the formation of a contract, ratification and relation back are inapposite

concepts. Winter clearly manifested his withdrawal from the agreement before the condition precedent to the formation of an enforceable contract occurred. Acceptance came too late.

We therefore affirm the trial court's conclusion that the instrument of March 21, 1984, did not subject the Winter voting shares to a right of first refusal.

■ There remains, however, the question of whether the 1977 instrument subjected Winter's stock to a right of first refusal. The appellants contend that the Boyer trustees are bound by the 1977 agreement. In his trust agreement, E.W. Boyer named Thomas Vennum as his cotrustee and appointed First National Bank of Minneapolis and Dorothy Lee Boyer as successor trustees to serve with Vennum upon Boyer's death. The trust charged the Bank, the corporate trustee, with "custody of all assets" and provided that the trustees could "hold any trust asset in bearer form or in the name of any one trustee." The trust also contained this provision:

No person or corporation dealing with the trustee * * * shall be required to ascertain whether or not the trustee is acting with another co-trustee of the trust but may deal with the trustee * * * as if the trustee were then the sole trustee hereunder.

Characterizing the foregoing provision as an "apparent authority" clause, the appellants assert that pursuant to the terms of the trust instrument the Bank's signature bound the trust to the December, 1977, agreement.

Had the Bank been dealing with a stranger, the appellants' argument would be cogent. The Bank was the record owner of the Vikings I voting shares, and the trust itself relieves one dealing with the Bank of the obligation to inquire about the existence of co-trustees. The other voting shareholders, however, were not unaware of the co-trustees. When, after E.W. Boyer's death, counsel for the trustees had requested reissuance of the Vikings I shares in the name of the Bank alone, he sent counsel for Winter and the corporation

copies of the Bank's and Mrs. Boyer's acceptance of appointment as trustees and of Thomas Vennum's advice that he would continue to exercise his powers as a trustee, and trust counsel expressly advised that although held by the Bank, the shares were subject to ultimate control by the three trustees. Counsel also stated that the trust instrument provided that a majority of the trustees could exercise the powers relative to the trust. Thus, the Bank could not be said to have "apparent authority" to act alone on behalf of the trust when it executed the 1977 agreement. *See Truck Crane Service Co. v. Barr-Nelson, Inc.,* 329 N.W.2d 824, 826 (Minn.1983); *Barton-Parker Mfg. Co. v. Wilson,* 96 Minn. 334, 104 N.W. 968 (1905).

The trial court found that a majority vote of the trustees was required for entry of the Boyer trusts into the 1977 agreement. Neither Mrs. Boyer nor Vennum had any recollection of the transaction. The trial court found that neither individual trustee had delegated to the Bank in writing sole authority to exercise discretionary powers, that the Bank had not conferred with either of the individual trustees, and that neither individual trustee had ever received a copy of the document. These findings are not clearly erroneous.

■ The conclusion that the Boyer trusts were not bound by the Bank's execution of the 1977 instrument does not, however, dispose of the question of whether Winter's shares were encumbered by that instrument. The trial court found that this instrument had two purposes—to bring about reorganization of the Vikings and to require any holder of voting stock to offer it to the voting shareholders before selling to an outsider. That court further found that "[n]either of these purposes could be achieved unless all of the holders of the Vikings voting stock were bound by the instrument." Despite a clause which stated: "It is further understood and agreed that this agreement shall be binding upon and inure to the benefit of those parties who are signatory hereto, whether or not executed by all parties," the trial court also found that "it was the mutual intent of the parties that unless all holders of voting stock were bound, none of them would be bound." [7] Because the trial court concluded that the Boyer trusts were not bound by the Bank's signature, it held that there was a failure of consideration and a lack of mutuality of obligation between the parties, making the instrument unenforceable. We agree that the December, 1977, instrument is unenforceable.

As Skoglund admits in his brief, and the trial court found, the instrument was clearly intended to be executed by all parties. The purposes of the agreement could not be accomplished without the participation of all the voting shareholders. It is for a similar reason that the 1984 instrument is unenforceable.

The December, 1977, instrument was signed in counterparts. The Bank, as a trustee of the Boyer trusts, signed first. Winter and Skoglund did not sign until after Vikings attorney Sheldon Kaplan received the counterpart executed by the Bank. Kaplan thought the Bank's signature bound the Boyer trusts and told Winter that they were bound. Skoglund also thought the Boyer trusts were bound by

---

7. Although this clause is some evidence of intent, the trial court examined all the evidence regarding the December, 1977, instrument and found that the intent of the parties was that no one should be bound unless all were. This is not construing a contract, but is instead determining whether an enforceable contract exists. Parol evidence is admissible for this purpose. *Hamilton v. Boyce,* 234 Minn. 290, 292, 48 N.W.2d 172, 173–74 (1951) ("In determining whether parol evidence is admissible, a distinction is drawn between evidence tending to show that no contract has ever been made and evidence to contradict, vary, or add to the terms of a written contract.") The trial court heard all the evidence and saw all the witnesses. It concluded that Winter and Skoglund did not intend to be bound unless the Boyer trusts were also bound. We do not disturb this conclusion. *See* Minn.R.Civ.P. 52.01 ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). This is not a case concerning only the interpretation of documentary evidence, but one in which there is significant oral evidence regarding intent. The clearly erroneous standard, therefore, applies. *See Toombs v. Daniels,* 361 N.W.2d 801, 805 (Minn.1985).

the Bank's signature and disputes before this court the trial court's conclusion that the trusts are not bound. Winter and Skoglund were, therefore, mutually mistaken.

■ If there is a mutual mistake concerning a material fact,[8] parties to a contract may avoid the contract. *See Gartner v. Eikill,* 319 N.W.2d 397, 398–99 (Minn. 1982); *Brecht v. Schramm,* 266 N.W.2d 514, 520 (Minn.1978); *see also* Restatement (Second) of Contracts § 152(1) (1981) ("Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake * * *.")

■ Here, the trial court found that the purposes of this 1977 instrument could not be accomplished unless *all* voting shareholders were bound. Winter and Skoglund believed that the Boyer trusts were bound and, therefore, that when they signed all parties would be bound. This was a basic assumption on which the contract was made and its falsity would materially change the bargain. If the Boyer trusts were not bound they could sell to an outsider or to either Skoglund or Winter, thereby making the Boyer stock more valuable and the Skoglund and Winter stock less valuable.

■ A contract may be avoided on the grounds of mutual mistake if the party seeking to avoid the contract did not assume the risk of the mistake. *See Gartner,* 319 N.W.2d at 399; Restatement (Second) of Contracts § 152 (1981). Because both Skoglund and Winter assented to the contract on the assumption that the Boyer trusts were already bound and that there was no risk that the trusts were not bound, neither Skoglund nor Winter assumed the risk that the Bank's signature would not bind the trusts. *Cf. Gartner,* 319 N.W.2d at 399; 3 A. Corbin, *Corbin on Contracts*

§ 605 at 641 (rev. ed. 1960). *See generally,* Restatement (Second) of Contracts § 154 (1981) (describing when a party bears the risk of a mistake).

Skoglund and Winter were mutually mistaken about a basic assumption that had a material effect on the agreed-upon exchange and neither assumed the risk of this mistake. The contract is, therefore, voidable. Restatement (Second) of Contracts § 152 (1981).

We therefore affirm the trial court and hold that Winter's shares are not subject to a right of first refusal under either the 1984 or the 1977 instrument.

Affirmed.

COYNE, Justice (concurring in part and dissenting in part).

While I concur in the majority's analysis of the instrument of March 21, 1984, I respectfully dissent from its holding that Winter's shares are not subject to the right of first refusal provided in the December 1977 agreement. Although, on the record before us, I might have found that the individual trustees concurred in the proposed 1977 agreement prior to its execution by the Bank, I agree that the trial court's finding to the contrary is not clearly erroneous. Nevertheless, that the Boyer trust was not bound by the Bank's execution of the document is not, in my opinion, the end of the matter.

As the trial court found, the purposes of the 1977 agreement were twofold:

(1) To bring about the reorganization of the Vikings and achieve equality of share ownership between Winter, the Skoglund interests and the Boyer trusts; and

(2) To require that any holder of voting stock offer such stock to the voting shareholders before selling it to another.

---

**8.** That the mistake may be one of law rather than of fact is not significant. *See Gartner v. Eikill,* 319 N.W.2d 397, 399–400 (Minn.1982); *see also Peterson v. First National Bank,* 162 Minn. 369, 375, 203 N.W. 53, 55 (1925) ("The idea that equity has no relief from mistakes of law had its origin in the almost humorous and wholly supposititious presumption that all know the law—a proposition contrary to both law and sense.").

The court also found that neither purpose could be achieved unless all of the voting shareholders were bound. Notwithstanding the ineffective execution of the document by the Boyer trustees, the reorganization was achieved in the precise manner provided in the document. Winter and Skoglund each transferred to Vikings II 350 Class B voting shares of Vikings I in exchange for only 200 Class B voting shares of Vikings II and assumption by the corporation of the indebtedness incurred in connection with their acquisition of the shares formerly owned by Northwest Publications. The 200 Class B voting shares of Vikings I held by the Boyer trusts were exchanged for 200 Class B voting shares of Vikings II and have since been retained by the Boyer trusts. Ever since 1978 the Boyer trusts have enjoyed the benefits of equal voting power conferred on the trusts by the exchange and by the contemporaneous performance by Winter and the Skoglunds of their agreement, while Winter and the Skoglunds have enjoyed relief from a $3 million debt. The corporate reorganization was completed almost 10 years ago. With or without the prior concurrence of the individual Boyer trustees, the first purpose of the 1977 agreement has been fully achieved. The trial court's finding is demonstrably wrong.

It must, of course, be conceded that without the prior concurrence of the individual trustees or written delegation of their authority, the Bank alone could not bind the Boyer trusts. But although a co-trustee cannot exercise a joint power individually, the invalidity of the action of a single trustee may be cured by ratification or acquiescence by the co-trustees. *See e.g., In re Gibbons' Estate,* 132 Neb. 538, 272 N.W. 553 (1937); *In re Towne's Estate,* 25 Pa.D. & C.Rep. 641 (1936). Ordinarily, receipt and retention by a principal of the benefits of his agent's unauthorized transaction constitute an affirmance or ratification unless the principal promptly repudiates the act. Restatement (Second) of Agency §§ 98 and 99 (1958). Furthermore, acqui-

escence in the retention of the benefits of the transaction constitutes an affirmance of the entire transaction—the burdens as well as the benefits. Restatement (Second) of Agency § 96, comment a. Not only have the Boyer trusts retained the benefit of the 1977 agreement for the corporate reorganization, but the individual trustees have never repudiated the Bank's action. Neither have the individual trustees ever rejected the burden placed on the shares by that agreement, though they must have known of the right of first refusal because Barbara Boyer Steele, a trust beneficiary, mentioned it during the discussions preceding the 1984 agreement. Were the Boyer trusts now attempting to escape the obligations imposed by the 1977 agreement, I have not the least doubt that the trustees would be held estopped to avoid the 1977 agreement. In fact, the Boyer trustees have asserted the December 1977 agreement as a defense and as a basis for their *counterclaim in this declaratory action.* These claims constitute a manifestation of affirmance which cannot be retracted. Whether they were intended as affirmance is immaterial. Restatement (Second) of Agency § 97 and comment a.

Affirmance of the 1977 agreement results not only in impressing the voting shares held by the Boyer trusts with the burden of a right of first refusal, but also *in conferring on the Boyer trustees the* benefit of a right of first refusal with respect to the voting shares held by Winter and Skoglund. Since, however, ratification of and acquiescence in the December 1977 agreement is raised only indirectly, it may be contended that that issue is beyond the scope of our inquiry and that we are limited to deciding whether Winter is bound by the 1977 agreement notwithstanding that its execution was ineffective to bind the Boyer trusts.[1]

Unlike the document signed on March 21, 1984, the agreement of December 1977 contains an express affirmation of the general rule that a party who signs and delivers an

---

**1.** It might also be argued that the 1977 agreement is severable and that acquiescence in the reorganization is not an affirmance of the right

of first refusal. *Cf. E. Edelman & Co. v. Queen Stove Works, Inc.,* 205 Minn. 7, 284 N.W. 838 (1939).

instrument is bound by the obligation therein assumed even though it is not executed by all the intended parties. *Naylor v. Stene,* 96 Minn. 57, 104 N.W. 685 (1905). Furthermore, that affirmation is set out in clear and unambiguous terms:

> It is further understood and agreed that this agreement shall be binding upon and inure to the benefit of those parties who are signatory hereto, whether or not executed by all parties.

Despite this language, the trial court found that it was the mutual intent of the parties that unless all holders of voting stock were bound, none of them would be bound. If the evidence of the subjective intent of the parties can be said to support this finding, their express or manifest intent cannot.

The majority dismisses the plain language of the contract with the offhand comment in a footnote that "this clause is some evidence of intent" and then countenances the substitution of some hidden and unexpressed intention for the manifest intention unequivocally set out in the 1977 document on the ground that "[t]his is not a case concerning only the interpretation of documentary evidence, but one in which there is significant oral evidence regarding intent." It is, however, fundamental to the law of contracts that clear and unambiguous language may not be varied either by application of principles of construction or by parol. *Kuhlmann v. Educational Publishers, Inc.,* 245 Minn. 171, 71 N.W.2d 889 (1955); *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979). If the language of the contract is, as here, plain and unambiguous, there is nothing to interpret. The intention clearly expressed by that language controls, rather than whatever may now be claimed to have been the actual intention of the parties. *Id.* Accordingly, I would hold Winter bound by the December 1977 contract upon his execution and delivery of the agreement to Skoglund and the Bank.

The majority permits Winter to avoid the contract on the ground that Winter and Skoglund were mutually mistaken in their belief that the Bank's signature had bound the Boyer trust. The mistake seems to have been tripartite, for the Bank appears to have labored justifiably under the same misapprehension. Regardless whether the mistake be considered one of fact or of law, it seems to me that it is not the kind of mistake that would render the contract voidable by either Winter or Skoglund.

One basic assumption on which any contract rests is the assumption that the parties to the contract are bound by their agreement. A lack of capacity to contract may make the contract voidable by that party. A typical instance of a voidable contract is the contract of a minor child. The child is not bound and may disavow the contract. The adult with whom the child contracts is, however, bound by the terms of the agreement, mistaken though the adult's assumption with respect to the child's capacity may have been. 2 Williston, Contracts § 245 (3d ed. 1959). The defect in execution on behalf of the Boyer trust may be less typical, but the Bank's inability to exercise a joint power without the joinder of one of the individual trustees comes to the same thing. The Boyer trustees may elect on behalf of the trusts to avoid the contract or, by ratification of the contract, to extinguish the power of avoidance. Until that election has been exercised, the contract has its usual legal consequences. One of the usual legal consequences is, of course, that Winter and Skoglund is each under an enforceable duty to offer his voting shares to the voting shareholders before selling them to another. Another is that until the Boyer trustees disaffirm the contract, the mistake has no effect on the agreed exchange of performances. *Matter of Estate of Rothko,* 43 N.Y.2d 305, 324, 372 N.E.2d 291, 299, 401 N.Y.S.2d 449, 457 (1977).

Even if the misapprehension regarding the Bank's capacity to act alone on behalf of the Boyer trusts constitutes the kind of mistake contemplated by Restatement (Second) of Contracts § 152 (1981), the condition necessary to permit avoidance is not present.[2] Certainly, if the Bank had not

---

**2.** Restatement (Second) of Contracts § 152 (1981) provides as follows:

executed the agreement before Winter and Skoglund, Winter could not now assert that he mistakenly assumed that the Boyer trusts were already obligated under the contract, but the fact that the Bank was the first party to act does not relieve the other parties of a risk expressly allocated to them by their agreement. Restatement, (Second) of Contracts § 154.[3] The 1977 agreement specifically provides that the agreement "shall be binding upon and inure to the benefit of those parties who are signatory thereto, whether or not executed by all parties." I see no reason to ignore that undertaking.

Furthermore, avoidance of a contract ordinarily contemplates restitution. While restitution may not be appropriate here, it may be observed that there has been no suggestion that avoidance should be accompanied by reversal of the exchange of the shares of Vikings I and II and assumption by the corporation of a substantial personal debt.

Winter contends, however, that even if the 1977 agreement was binding on him and Skoglund when executed, it was subsequently abandoned. Although rights under a contract may be lost by waiver or abandonment, abandonment must be proved by clear and convincing evidence. *Republic Nat'l Life Ins. Co. v. Marquette Bank & Trust Co.*, 295 N.W.2d 89, 93 (Minn.1980). Acts indicating waiver or abandonment must be clear, unequivocal, and inconsistent with the existence of the contract. *Desnick v. Mast*, 311 Minn. 356, 365, 249 N.W.2d 878, 884 (1976); *Buresh v. Mullen*, 296 Minn. 150, 153, 207 N.W.2d 279, 281 (1973). Acquiescence in a transfer of shares in derogation of a right of first refusal, failure to exercise the right, and a prior course of conduct or dealings by the person seeking to enforce the agreement directly inconsistent with the continued viability of the agreement are all events from which waiver or abandonment may be implied. *See Stenehjem v. Sette*, 240 N.W.2d 596, 601 (N.D.1976); *Thompson v. Anderson*, 209 Kan. 547, 555–56, 498 P.2d 1, 7–8 (1972). There is no evidence of such conduct by any of the parties to this agreement. From December 1977 to October 12, 1985, there had been no sale or attempted sale of voting shares. Hence, there had been no opportunity to exercise the right of first refusal or to acquiesce in a transfer violative of the agreement. While the parties ignored the requirement that notice of the right be placed as a legend on the stock certificate, there was in 1977 no statutory requirement that shareholder agreements restricting transfer be noted on the stock certificate. And although no mention of the restriction was made in response to inquiries regarding the purchase of shares, until October 12, 1985, all inquiries were rebuffed by the answer that there were no shares available for sale. Thus, while it can be said that over the years the parties paid little attention to the 1977 agreement, it must be recognized that there had been no occasion to look to the right of first refusal embodied in the agreement. Conduct which is equally consistent with the continuance of a contract and with abandonment or waiver simply does not rise to proof by clear and convincing evidence that the parties have abandoned their agreement.

**§ 152. When Mistake of Both Parties Makes a Contract Voidable**
(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.
(2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.

3. Restatement (Second) of Contracts § 154 provides as follows:
**§ 154. When a Party Bears the Risk of a Mistake**
A party bears the risk of a mistake when
(a) the risk is allocated to him by agreement of the parties, or
(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Accordingly, I would reverse the decision of the trial court and hold Winter's shares subject to the right of first refusal provided in the December 1977 agreement.

KELLEY, Justice (dissenting).

I join in the dissent of Justice Coyne.

WAHL, Justice (dissenting).

I join in the dissent of Justice Coyne.